ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

FILED CLERK
U.S. DISTRICT COURT

04 OCT 15 PM 2: 09

TEXAS EASTERN

BY _____

|  |  |
|---|---|
| ALASKA ELECTRICAL PENSION FUND, Derivatively on behalf of ELECTRONIC DATA SYSTEMS CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>RICHARD H. BROWN, ROGER A. ENRICO, RAY J. GROVES, RAY L. HUNT, C. ROBERT KIDDER, JUDITH RODIN, JAMES A. BAKER III, WILLIAM H. GRAY III, WILLIAM M. DALEY, JAMES E. DALEY, JEFFREY M. HELLER, DOUGLAS L. FREDERICK, ROBERT H. SWAN, FRED G. STEINGRABER, MICHAEL H. JORDAN, PAUL J. CHIAPPARONE, TROY TODD, JOHN W. MCCAIN, KIM L. MCMANN and KPMG, LLP,<br><br>Defendants,<br><br>– and –<br><br>ELECTRONIC DATA SYSTEMS CORPORATION, a Delaware corporation,<br><br>Nominal Defendant. | Civil Action No. 6:04 CV 464<br><br>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY; ABUSE OF CONTROL; GROSS MISMANAGEMENT; CONSTRUCTIVE FRAUD; WASTE AND UNJUST ENRICHMENT; PROFESSIONAL NEGLIGENCE AND ACCOUNTING MALPRACTICE; AND AIDING AND ABETTING – SEEKING EQUITABLE RELIEF AND DAMAGES |

DEMAND FOR JURY TRIAL

Copyright © 2004 by William S. Lerach and Lerach Coughlin Stoia Geller Rudman & Robbins LLP.  William S. Lerach and Lerach Coughlin Stoia Geller Rudman & Robbins LLP will vigorously defend all of their rights to this writing/publication.  No copyright is claimed in the text of statutes, regulations, and any excerpts from analysts' reports quoted within this work.

All rights reserved – including the right to reproduce in whole or in part in any form.  Any reproduction in any form by anyone of the material contained herein without the permission of William S. Lerach and Lerach Coughlin Stoia Geller Rudman & Robbins LLP is prohibited.

# PREAMBLE

*"Quis Custodiet Custodies?"*
*"But Who Will Guard the Guards Themselves?"*

*Juvenal*

# INTRODUCTION

1.      This is a shareholder derivative action on behalf of Electronic Data Systems Corporation ("EDS") against several of EDS's current and past executives and directors (the "Individual Defendants") and KPMG, LLP ("KPMG"), EDS's outside auditing firm, which evaluated its internal financial and accounting controls and certified its FY 2000-2003 financial statements (collectively "defendants"). **The Individual Defendants include a majority of EDS's current directors**, as well as its current Chairman/CEO, President/COO and CFO. The claims arise from defendants' grossly negligent and reckless acts between September 1999 and mid-2003 (the "Relevant Period"), including mismanaging EDS's business and finances, misrepresenting the success and financial condition of EDS's business as well as the state of its internal financial accounting and disclosure controls to EDS's shareholders, and manipulating and falsifying EDS's reported financial results, allowing several of EDS's top executives to loot EDS of millions of dollars via bonuses paid based on phony profits, to obtain millions of dollars of other wasteful compensation, severance or retirement payments/benefits, and to sell over 258,000 shares of EDS common stock at prices artificially inflated by their own materially false and misleading statements to the market concerning EDS's business operations and financial status, receiving over $16.7 million in proceeds.

2.      EDS provides information technology services to corporations and governmental agencies that "outsource" such functions to EDS. EDS seeks large, long-term outsourcing contracts – which can take 10 years or more to perform. Over 75% of EDS's revenues have come from this

- 1 -

"information technology" ("IT") part of its business. Beginning in early 1999, EDS's senior officers and directors caused it to recklessly undertake a purported "turnaround" plan, whereby it entered into a number of mega IT contracts to attempt to restore EDS's role as a major player in the IT field, competing with giants like IBM. However, these contracts were deliberately "underbid" so that EDS's management team could claim success in these undertakings even though EDS lacked the necessary infrastructure, management talent and cost and contract performance controls necessary for EDS to successfully perform the contracts, and then lie to EDS shareholders about the extent of EDS's capabilities and progress. EDS, during 1999-2000, had serious problems with several of the large IT contracts defendants caused it to enter into during those years. Two in particular resulted in calamity and huge losses for EDS: its 1999 contract with MCI Worldcom ("Worldcom") and its 2000 contract with the U.S. Navy.

3. As is often the case with long-term contracts with stringent performance standards or benchmarks, EDS does not receive payment for work performed until months or years after that work is performed – and then only if the terms of the contracts are actually met. Historically, however, EDS recognized and reported revenue from many of its mega-contracts under the "percentage-of-completion" method of accounting, pursuant to which, under strictly specified circumstances, companies were permitted to record revenue as work on the contract progressed, rather than waiting until the customer paid – or in some instances was even billed – for the work performed. Generally Accepted Accounting Principles ("GAAP") permitted companies to recognize revenue under this method of accounting *only* if the company was able to make *dependable* estimates of the extent of its progress toward *successful*, *i.e.*, profitable, completion of the contract, including the amount of contract performance costs and of the revenues and profits that would actually be earned over the life of the contract. However, GAAP required that *any losses that were*

- 2 -

*likely to be incurred on the contract had to be recognized as soon as they were evident or could be estimated.*

4.    Beginning as early as the fiscal year ended December 31, 2000, and continuing through the first half of 2003, EDS's executives and directors improperly abused percentage-of-completion accounting to artificially inflate EDS's financial results by improperly recognizing hundreds of millions of dollars in revenue on and concealing billions of dollars of losses on several long-term contracts, the largest and most important of which was a huge contract with the U.S. Navy (the "NMCI" or "Navy Contract"), which required that EDS replace the U.S. Navy's and Marine Corps' existing computer network with a new advanced "intranet" over several years.  Under the terms of the Navy Contract, which EDS valued at $7+ billion, the Navy was not required to pay EDS for work done until it was satisfied with the performance of the equipment and services provided and other performance/quality benchmarks were met.  Nevertheless, the Company's executives and directors caused EDS to improperly recognize huge amounts of revenue as it delivered workstations and other equipment to the Navy, even though: (i) the equipment was defective and failed to satisfy the criteria for acceptance set forth in the Navy Contract, and (ii) the costs of contract performance were spiraling out of control and performance was hopelessly behind schedule.  In this way defendants concealed that EDS was actually suffering huge losses on that contract and several others.

5.    In October of 1999, EDS's management, with the approval of the Board, finalized a combined $12.4 billion "partnership" with WorldCom which had been originally announced in February 1999 (the "WorldCom Contract").  This deal required EDS to resell more than $400 million of WorldCom's services *each year* to other customers or risk paying hundreds of millions of dollars in penalties to WorldCom.  Since first announcing the WorldCom Contract in February 1999,

defendants caused WorldCom to stress the positives of the deal while failing to disclose that the defendants knew the contract had committed EDS to more sales than it could ever produce, thus assuring substantial penalties. Filings in WorldCom's bankruptcy demonstrate that EDS was constantly struggling to find customers and had difficulty meeting its minimum commitment from the very beginning, causing "significant friction in the relationship between EDS and MCI WorldCom, as each company blamed the other for the failure to generate anticipated network revenues." EDS was ultimately forced to renegotiate the contract, pay WorldCom $187 million and drop EDS's claims against WorldCom in order to settle WorldCom's claims against EDS for failing to perform its contractual obligations, forcing EDS to take $118 million in reserves and write-downs on the WorldCom Contract.

6.     Prior to the finalization of the WorldCom Contract, EDS's stock declined sharply from almost $70 per share to the low $50s. Thus in late September 1999, the EDS Board caused the Company to embark on a huge common stock repurchase program through which EDS would repurchase 27 million shares of its own stock on the open market, issuing $1.5 billion in debt to finance the buyback, spending approximately $1.5 billion between September 27, 1999 and December 31, 1999, to buy shares back at an average of $55 per share. As a result of the media blitz over the signing of the WorldCom Contract and the run-up in the Company's stock price caused by the repurchase of $1.5 billion worth of the Company's shares, EDS's stock price spiraled from approximately $50 per share to over $70 per share during the fourth quarter of 1999. While EDS's top executives and Board were causing EDS to spend $1.5 billion to purchase its own stock on the open market, certain EDS insiders sold off their own EDS stock, including Individual Defendant Fred Steingraber who was integrally involved in the EDS/WorldCom Contract and who sold over 60,000 shares of EDS stock on November 10, 1999 for almost $4 million in proceeds.

7.     Although EDS's stock rallied strongly on the finalization of the WorldCom Contract and the demand created by the huge stock buy-back, in mid-June 2000 the stock collapsed very sharply from the mid-$60s to below $50 to as low as $39 a share – a truly massive collapse – when EDS revealed a substantial 2Q 00 earnings shortfall which immediately called into substantial doubt the success of defendant Richard H. Brown's management team's much ballyhooed turnaround efforts. The stunning collapse of EDS's stock did, in fact, call into question the success of the purported turnaround plan and demonstrated in stark terms to Brown and the other EDS executives that the market would utterly savage EDS's stock and thus endanger their managerial positions unless real consistent concrete progress on the turnaround could be demonstrated. As a result, Brown, the other EDS executives and the EDS Board undertook to pull out all the stops necessary to halt the decline in the stock and demonstrate to EDS shareholders that in fact the turnaround was succeeding, something they did by making a hugely improvident decision to agree to terms on the Navy Contract which they knew would likely result in EDS suffering huge losses over time, but which they had to do to secure the contract so that it could be announced and make it look like their turnaround was succeeding. Thus in October 2000, EDS announced the huge Navy Contract, even though Brown had been warned it would never produce a profit, enabling Brown to tell EDS shareholders a few weeks later that "our contracts for 00 will be far in excess of last year's record $25 billion." The apparent renewed success of the turnaround effort caused the price of EDS stock to rise sharply higher from the low $40s almost back to $70 a share. However, when Brown saw the stock soaring to what he knew were inflated and unsustainable levels, in February 2001 he unloaded 50,000 shares of his EDS stock for nearly $3.2 million.

8.     This action seeks to remedy these breaches of fiduciary duty, as well as the EDS officers' and directors' abuse of control, fraud, waste, unjust enrichment and gross mismanagement

- 5 -

by recovering damages from the Individual Defendants (or EDS's directors' and officers' insurance coverage) and by reforming and restructuring EDS's corporate governance to make its Board and executives more accountable to the owners of the Company and lessen the likelihood of a recurrence of these awful events. ***Defendants' illegal actions have already badly damaged EDS***, causing EDS to lose billions of dollars, wiping out billions of dollars of EDS's market capitalization and shareholders' equity, wasting millions and millions of dollars of its assets and crippling its information technology business, resulting in plunging free cash flow and new contract signings. All of this has forced EDS to cut its quarterly common stock dividend by 66% to just $.05 per share and to borrow over $1 billion, which has gravely impaired EDS's credit ratings, corporate reputation and goodwill. The action also seeks damages from KPMG, including disgorgement of the auditing, accounting and consulting fees received by KPMG during 1999-2003.

9.      Defendants' misconduct also caused EDS to violate the U.S. federal securities laws, including the Sarbanes-Oxley Act, and the U.S. Employee Retirement Income Security Act ("ERISA"), during 1999-2003, resulting in massive potential liability against EDS, for which it has been sued in several class action lawsuits, and a major U.S. Securities and Exchange Commission ("SEC") investigation of EDS. Again, their misconduct has ***already caused EDS to suffer huge damages***, including the expense of defending those civil suits and regulatory investigations. This illegal conduct has also left EDS exposed to billions of dollars of additional damage from liability for violations of the U.S. investor protection and retirement security laws, *i.e.*, the damages, financial penalties and/or fines which will result from those proceedings. However, regardless of the outcome of the securities or ERISA class actions or the SEC investigation, EDS has already suffered billions of dollars of damage due to defendants' misconduct and breaches of duty.

- 6 -

# SUMMARY OF COMPLAINT

10.     EDS was founded in 1962 by H. Ross Perot and, according to *Forbes*, "run like a para
military organization until he sold EDS to General Motors in 1984." But according to the same
*Forbes* article, by the time EDS was spun-off by GM to its shareholders in 1996, it "had grown into
an unwieldy monster."

11.     By the late 1990s, EDS's business was performing poorly, as was its stock price,
putting pressure on EDS's Board of Directors to improve the performance of both EDS's business
and its stock. In early 1999, a new top executive team, hired, overseen and controlled by EDS's
Board, took over at EDS, led by Richard H. Brown ("Brown") (the new Chairman and CEO), James
E. Daley ("Daley") (the new CFO) and Douglas L. Frederick ("Frederick") (the new EVP in charge
of EDS's information technology outsourcing business). Brown, Daley and Frederick, along with
Jeffrey M. Heller ("Heller") (EDS's then Vice Chairman and Chief Operating Officer), were to
attempt to achieve a "turnaround" of EDS, to overcome its poor performance of recent years.
Brown, Daley, Heller and Frederick were all to receive substantial bonus compensation and other
economic benefits if they were successful in turning EDS around by improving its revenues,
profitability and thus boosting its stock price.

12.     As they were restructuring EDS during 1999 – including firing virtually all of EDS's
then top executives and 15,000 other employees, many of whom were highly competent and
experienced mid-level managers – the Brown-led management team, with the approval of the EDS
Board, embarked on a massive expansion program which included signing several large long-term
IT outsourcing contracts. One huge contract was a $6.4 billion IT contract with WorldCom finalized
in the Fall of 1999. The largest of these contracts – announced in the Fall of 2000 – was the
$7+ billion Navy Contract. These large contracts had to be performed simultaneously even though

EDS lacked the management personnel, financial cost and accounting controls and contract performance monitoring systems necessary to do so. However, in a misguided attempt to try to create the appearance of a rapid and successful turnaround and to make it appear EDS was obtaining large and profitable IT management contracts, EDS's executives and Board accepted several large contracts with dangerously low projected profit margins and even ones on which they knew EDS would almost surely lose money – including the Navy and WorldCom Contracts, where Brown, Daley, Heller, Frederick and the EDS Board all knew it was virtually certain from day one that EDS would suffer losses.

13.     During 1999-2002, as EDS attempted to perform these large IT management contracts, it encountered substantial, serious and persistent problems with many of them, including: (i) delays in performance and an inability to properly perform due to defects in EDS-provided hardware and software necessary for contract performance; (ii) a lack of sufficient experienced management personnel to oversee and manage contract performance; (iii) problems making its sales commitments as to the WorldCom Contract; and (iv) a lack of adequate contract performance monitoring systems and procedures, as well as grossly defective and deficient internal financial, accounting and cost controls.

14.     EDS's rapid expansion plan under its new management team quickly spun out of control. EDS's top executives and directors had caused EDS to undertake far too many large contracts in far too short a time – grossly underestimating the cost of contract performance and accepting many losing contracts, simply so they could publicly announce these contracts and then, by misstating their success at meeting the WorldCom Contract terms and abusing percentage-of-completion accounting on the Navy Contract, quickly boost EDS's revenues and profits, making it appear EPS was growing and achieving increasing profitability, *i.e.*, the turnaround was succeeding!

Due to the large number of contracts EDS's top executives and directors had caused it to enter into in such a short period of time, EDS did not perform the type of pre-contract evaluations and due diligence necessary to protect EDS from entering into contracts it was likely to suffer losses on, or have in place the type of monitoring, reporting and cost control systems and procedures necessary to perform so many large contracts simultaneously. This resulted in EDS, by the end of 2000, ending up with many under-priced contracts, which EDS was unable to successfully, *i.e.* profitably, perform, as well as defective internal cost, accounting and disclosure control systems, all of which were combining to cause EDS to actually suffer large losses – not the profits its insiders caused it to report to protect their own positions of power, prestige and profit.

15.     By late 2000, the Navy Contract, the WorldCom Contract, and several other large contracts were badly harming EDS's business operations – a reality which EDS's then-top executives and directors concealed by improperly and delinquently recognizing billions of dollars of losses in connection with those contracts and by falsifying EDS's financial statements in various other ways to boost EDS's reported revenues and profits throughout 1999-2002, and most of 2003. The dissemination of this materially false and misleading information misled EDS's shareholders into re-electing the Board of Directors during 1999-2003. EDS's then-top executives and directors also did this in order to cover up their gross mismanagement of EDS and to hold onto their positions of power, prestige and profit at EDS for as long as possible and to position the executives to loot EDS of millions of dollars *if they could cause EDS to report large profits for 1999-2003*.

16.     As part of this cover-up, during 1999-2003, EDS's then top executives and directors repeatedly lied to EDS's shareholders regarding their success in turning EDS around, as well as the ongoing success and profitability of EDS's business and its future prospects. They did this by (i) over-hyping the financial benefits of the WorldCom Contract and EDS's ability to profit from it

in 1999-2002; (ii) manipulating and inflating EDS's reported revenues and results from operations by the abuse of percentage-of-completion accounting, enabling EDS to report strong 2000-2002 revenues and profits when, in fact, losses had been suffered; and (iii) during 2003, concealing the true extent of EDS's losses and accounting abuses. They also falsely assured EDS's shareholders that notwithstanding deteriorating market conditions in EDS's main business areas and the problems being encountered by its competitors, EDS's business was continuing to perform extremely well due to unique factors, including the skills of the EDS management team, which largely insulated EDS from the adverse impact of these negative conditions. They also repeatedly assured EDS's shareholders that during 1999-2002 and most of 2003 EDS would achieve very strong revenue, profit and cash flow growth. As a result, EDS's stock traded at artificially inflated levels during the Relevant Period, reaching its all-time high of $71.88 in mid-2001. And, as a result of EDS's purported stellar revenue and earnings reported during 1999-2002 and most of 2003, EDS's top executives and managers cashed in. Several EDS officers and directors, including Brown, sold hundreds of thousands of shares of EDS stock at inflated prices caused by their false and misleading statements. EDS's top executives also received the following $136 million in salaries, bonuses and other benefits, based on EDS's 2000-2002 revenues and profits, while the value of their EDS stock options and other stock rights also soared in value by millions and millions of dollars:

| Name | Year | Salary | Bonus | Long-Term Comp. Awards | Other Compensation | Total |
|------|------|--------|-------|------------------------|--------------------|-------|
| Richard Brown | 2000 | $1.5 M | $3.4 M | -- | $468,160 | *5.4 M* |
| | 2001 | 1.5 M | 7 M | $46.1 M | 357,628 | *55 M* |
| | 2002 | 1.5 M | -- | -- | 520,677 | *2 M* |
| Jeffrey Heller | 2000 | 712,036 | 1.3 M | 5.2 M | 245,883 | *7.5 M* |
| | 2001 | 737,036 | 1.6 M | 3.6 M | 3 M | *9 M* |
| James Daley | 2000 | 535,000 | 929,830 | 4.5 M | 112,467 | *6 M* |
| | 2001 | 585,000 | 1.5 M | 6.4 M | 79,457 | *8.6 M* |
| | 2002 | 585,000 | -- | 5 M | 144,046 | *5.7 M* |
| Douglas Frederick | 2000 | 385,000 | 608,300 | *unknown* | 31,044 | *1 M* |
| | 2001 | 460,000 | 1.1 M | 1.4 M | 52,365 | *3 M* |
| | 2002 | 488,334 | -- | 2.5 M | 108,887 | *3 M* |
| Paul Chiapparone | 2000 | 508,334 | 951,950 | 3 M | 36,235 | *4.5 M* |
| | 2001 | 600,000 | 1.5 M | 4.9 M | 1.9 M | *8.9 M* |
| | 2002 | 653,125 | -- | 4 M | 203,044 | *4.9 M* |
| Troy Todd | 2000 | 415,000 | 786,840 | 4.5 M | 78,924 | *5.8 M* |
| | 2001 | 465,000 | 1.2 M | 3.9 M | 93,769 | *5.7 M* |
| *TOTAL* | | | | | | *$136 M* |

**WorldCom**

17.     On February 11, 1999, defendants caused EDS to announce a new partnership with

WorldCom whereby both companies would exchange services in a deal with a combined value of

over $12 billion to both companies.  Brown called the deal a "major step" in EDS's turnaround.

Defendants caused EDS to issue a joint press release with WorldCom entitled "EDS and MCI

WorldCom Align to Capitalize on Global Electronic Business, Communications and Data Services

Markets; Companies Agree to Significant Outsourcing Agreements; EDS Purchases MCI

Systemhouse for $1.65 Billion."  The press release stated in relevant part:

> In one of the largest agreements of its kind, EDS and MCI WorldCom today
> announced a framework that positions the companies to seize opportunities in the
> converging global communications and computing markets.  Each company and its

customers will be better positioned to capitalize on the rapid growth in electronic business and global communications services.

*     *     *

"Aligning with MCI WorldCom and its global telecommunications capabilities will enhance EDS' ability to serve our customers as they move into the digital world of electronic business," said Dick Brown, EDS chairman and CEO. "This relationship assures that both EDS and those we serve are positioned to capitalize on the cresting wave of global data and voice network services.

"We are also enthusiastic about working with the people who will be joining EDS from MCI WorldCom and Systemhouse," Brown continued. "To us, today's announcement offers the best of all worlds -- new business, new capabilities, new customers, new markets and new highly skilled and talented employees."

*     *     *

According to Brown, "network capabilities are increasingly important to companies that want to emerge as the business leaders of the 21st century. Our customers in all industries and in every geography are placing growing emphasis on advanced network capabilities and the development of electronic business applications. We intend to be there for them -- and our relationship with MCI WorldCom will play a major role in seeing that happen."

18.     In April 1999, WorldCom transferred ownership of its own IT services company, Systemhouse, to EDS. According to defendants at the time, EDS's $1.65 billion acquisition of Systemhouse was intended to augment EDS's applications consulting and systems integration business, part of a wide-ranging, $16 billion (combined) agreement between EDS and WorldCom. As part of the pact, WorldCom would outsource a significant amount of its IT services to EDS, which assumed responsibility for WorldCom's business-process management activities for selected billing functions, applications development and maintenance, mainframe operations, desktop and help-desk services, and local area network support over the following decade in a deal purported by defendants to be worth between $5 billion and $7 billion to EDS. In return, EDS would outsource the lion's share of its global network to WorldCom, which would handle end-to-end management of EDS's voice, data and video communications services in a deal stated by defendants to be worth

between $6 billion and $8.5 billion for WorldCom over the following 10 years.  As part of this transaction, defendants said some 1,000 employees from EDS would join WorldCom, while more than 12,000 employees from WorldCom and Systemhouse would shift to EDS.

19.     In May 1999, Brown announced at a conference in New York a major corporate reorganization, including the formation of EDS's newest growth engine, E-Business Solutions. According to Brown, the new unit would combine and create strengths in solutions consulting and business process management, two capabilities critical to success in the electronic business market. It would also create a bridge between EDS's high-value-added management consulting, provided by EDS subsidiary A.T. Kearney, and the Company's new core IT outsourcing business, Systemshouse. Defendant Fred G. Steingraber ("Steingraber"), Chairman and CEO of A.T. Kearney, would play an important role in executing the turnaround.

20.     However, defendants concealed from EDS's shareholders that between the February 1999 announcement of the WorldCom/EDS contract and the October 1999 contract signing, the two companies were at significant odds as to the actual terms of the deal. They did not disclose that WorldCom was forcing EDS to commit to unattainable "minimum purchase requirements" backed by draconian "take or pay" penalty provisions.  In fact, it would not be until July 1, 2002, that the complexities of the arrangement with WorldCom became known, including that there were actually two components of EDS's annual revenue commitment to Worldcom: a cumulative take-or-pay revenue threshold that increased by $400 million per year, and a higher cumulative threshold that increased by $600 million per year, which included the first $400 million threshold.  In the event EDS failed to meet the higher annual threshold, or "minimum commitment," EDS would be forced to pay WorldCom 20% of the difference between EDS's actual spending and the higher threshold. EDS was also obligated to pay 100% of any shortfall below the $400 million take-or-pay threshold.

- 13 -

21.     On October 22, 1999, WorldCom and EDS executed the Global Network Outsourcing Agreement ("GNOA"), an eleven-year outsourcing agreement. Pursuant to the GNOA, WorldCom agreed to supply, and EDS agreed to purchase, various telecommunication services. The GNOA required EDS to purchase a minimum amount of services from WorldCom during each year of the GNOA for itself or to meet its customers' telecom needs. EDS was required to make a shortfall payment each year it did not meet its minimum obligations, pursuant to a Cumulative Network Minimum and a Cumulative Network Take-or-Pay Minimum. Defendants' press release on October 25, 1999 cited defendant Brown, proclaiming: "*EDS and MCI WorldCom worked diligently and carefully to structure a relationship that is right both for our companies and for our respective clients*," and "*[t]his relationship sets a new standard for global collaboration, putting us on course to meet and exceed our strategic objectives*.'" Defendants did not accurately disclose to EDS shareholders the substantial commitment EDS had agreed to in the WorldCom Contract or *that EDS's senior officers knew EDS could not meet those commitments.*

22.     Between 2000 and Worldcom's bankruptcy in July 2002, the two companies constantly fought acrimoniously about EDS's failure to meet its commitments. As detailed in the Motion of WorldCom to Approve Settlement and Compromise of Disputes with Electronics Data Systems Corporation and EDS Information Systems, L.L.C. which finally resolved the dispute with WorldCom's bankruptcy estate in December 2002:

> *The difficult nature of the day-to-day relationship between EDS and MCI WorldCom became evident from the beginning. During the first year of the GNOA (2000), it became clear that EDS would not meet its Minimums obligation for that year. This fact caused significant friction in the relationship between EDS and MCI WorldCom, as each company blamed the other for the failure to generate anticipated network revenues.*

23.     In fact, unbeknownst to EDS shareholders, by 2Q 01, WorldCom began to focus on the ratable accrual of EDS's penalty payments, and by mid-June 2001, internal WorldCom forecasts

were showing that EDS would again (for the second year in a row) fall short of its annual take-or-pay commitment. At the time, based on EDS's performance, WorldCom was internally forecasting that it was likely EDS would miss the five-year minimum commitment, and would therefore be required to refund the $100 million pre-payment starting in 2005. By June 14, 2001, WorldCom was so confident, based on EDS's performance thus far, that EDS would miss the five-year minimum commitment that WorldCom decided to begin immediately recognizing revenue for the payments EDS would be obligated to make starting in 2005 for falling short of its five-year commitment, recognizing a "catch-up" payment valued at $30 million in the second quarter, and $5 million in each subsequent quarter. *But EDS was not recognizing an expense for the pre-payment penalties and was not disclosing to its shareholders the extent of problems it was having meeting the minimum commitment required by the WorldCom Contract.* In the end, EDS would pay WorldCom $187 million for its failure to meet its minimum commitments, would have to waive claims against WorldCom for sums owed to EDS in WorldCom's bankruptcy and would have to take a $118 write-down on the WorldCom Contract.

**The Navy Contract**

24.     EDS's improper recognition of revenue and avoidance of the losses it was actually suffering on the Navy Contract during 2000-2002 violated GAAP. As the Company ultimately was forced to admit, it suffered from horrible cost overruns, delays and other performance problems on the Navy Contract and significant deficiencies in its ability to estimate revenues and costs on the contract, which precluded EDS from recognizing revenue using the percentage-of-completion method of accounting and ultimately resulted in losses or write-offs of over $2 billion on the Navy Contract alone. EDS's products delivered during 2000-2002 failed to meet the Navy's criteria for acceptance, which precluded revenue recognition under the percentage-of-completion method. In

addition to having to fix and rework defective products, EDS failed to account properly for the increased costs associated with curing these defects. In accounting for the Navy Contract, EDS used a "zero profit" methodology, whereby EDS recognized revenues equal to costs incurred despite the fact that costs were exceeding revenues by more than hundreds of millions of dollars due to the need to correct substantial defects in EDS's products, cost overruns and delays in performance. Defendants hid these huge losses from EDS's shareholders. When the truth finally came out, EDS recorded charges of $2.8 billion and Brown, Daley, Heller and Frederick were forced out of the Company.

25.    EDS's overstatement of its revenues and avoidance of reporting losses in connection with the WorldCom and Navy Contracts was orchestrated by Brown, Heller, Daley and Frederick, the top officers of EDS during 1999-2002. These top officers consistently received reports of the status of EDS's major contracts, including the WorldCom and Navy Contracts – two of the largest contracts in EDS's history. Further, they, as well as the members of the EDS Board of Directors and Audit Committee, were responsible for ensuring the accuracy of EDS's financial reporting and the adequacy of its internal financial accounting and disclosure controls. They (or their successors) caused certifications to be filed with the SEC during 2002-2003 attesting to the accuracy of EDS's financial statements and the adequacy of its internal and disclosure controls. Therefore, Brown, Daley, Heller, Frederick and the EDS Board knew or recklessly disregarded that EDS was not meeting the minimum sales requirement on the WorldCom Contract, creating a lot of friction between WorldCom and EDS, potentially resulting in EDS's being liable for a penalty payment to WorldCom, and that as a result of the problems with and delays and cost overruns arising from the delivery of EDS's defective products and the discovery of thousands of software applications on the Navy's prior computer system which were incompatible with the new intranet, EDS was not

permitted to recognize revenue on the Navy Contract as work "performed" under GAAP, and that EDS was, in fact, suffering huge losses. Nevertheless, these faithless fiduciaries not only permitted EDS to continue reporting positive statements on the WorldCom Contract and recognizing revenue on the Navy Contract to help meet prevailing revenue expectations, but secretly tried to mediate their WorldCom shortfalls and actually sped up the delivery of defective work product to the Navy, hiding the growing losses associated with this significant engagement, so as to conceal their own mismanagement and failure of oversight so they could continue to hold onto their positions of power, prestige and profit at EDS.

26.     During 1999-2002 and continuing through late 2003, EDS's top executives (and its Board) repeatedly lied to EDS shareholders. When the WorldCom Contract was announced, Brown promised that he had worked "*diligently and carefully*" to structure the relationship and that the deal set "*a new standard*" and put EDS "*on course to meet and exceed [its] strategic objectives*." When the Navy Contract was announced, defendants said the revenues it would produce would be a "*gusher*." During the balance of 2000, defendants told EDS shareholders that "*the trend is in the right direction*," they were "*pleased with the progress EDS has made*" and were "*building on that momentum*." They said, "*the trend is in the right direction*," and that new contract signings in 2000 would "*far exceed*" the 1999 contract signings. During 2001, as EDS reported better-than-forecast financial results, they said EDS's "*robust, balanced performance demonstrates EDS' ability to anticipate and capitalize on changes*," that there was "*no slowdown*" in its business, that EDS was "*a growth company in a growth industry*," its *profits were "well-insulated" from rescission*, it was "*on track*" to achieve record revenues and EDS was "*building a foundation for sustainable, long-term profitable growth*" as it had "*adequate free cash flow and other sources of capital to fuel growth*."

27.     During 2002, these glowing assurances continued, even in the face of *Wall Street Journal* and *Business Week* articles raising questions regarding EDS's accounting practices and rumors of problems with large contracts. Nevertheless, defendants assured EDS shareholders that the Company's business was "***not softening***," that "***improvements in cash flow and earnings per share were expected***." "***You can trust us. We don't mislead***," they said. Defendants said EDS's accounting practices were "***conservative, concise and complete***," with no hidden liabilities, and that EDS had a "***rock solid***" financial foundation. As to the huge Navy Contract, defendants caused EDS to tell its shareholders "***we like where we are***" – "***doing very well***." Defendants also continued to stress EDS's "***robust***" contract signings and promised the Company's contracts would generate strong cash flow of $700-$900 million in 2002 and $1.5 billion in 2003! The EDS Board and executive team assured EDS shareholders that they were "***very confident***" about EDS's business and that its business would "***grow faster than the industry***." As to rumors of contract problems, they assured shareholders that "***rumor, speculation and innuendo" are false***, as the Company's "***business and financial fundamentals are sound***," leaving EDS poised for "***strong revenue growth***," and that the Company was confident that its "***conservative, consistent, clear and complete***" accounting practices and policies complied with GAAP. In short, defendants represented that EDS was "***on track***" to meet its forecasts of soaring profits and free cash flow and that its business model was "***right on target***."

28.     Defendants caused EDS to report 2000 revenues of $19.2 billion up from $18.5 billion in 1999 and profits of $1.1 billion, compared to $957 million for 1999, and new contract signings in 2000 for $32 billion, compared to $25 billion in 1999, which allowed EDS's top executives to pocket millions of dollars of bonuses and other compensation. Defendants also caused EDS to report 2001 revenues of $21.5 billion up from $19.2 billion in 2000, and profits of $1.4

billion, compared to $1.1 billion for 2000, and new contract signings worth $31.2 billion, which allowed EDS's top executives to pocket millions of dollars of bonuses and other compensation. Defendants reported first half 2002 revenues and profits of $10.8 billion and $670 million, respectively – increases over the first six months of 2001. At various times, defendants also caused EDS to forecast free cash flow of $800 million for 2002, $1.5 billion for 2003 and over $1 billion for 2004.

29.    However, by September 2002, EDS's then top executives and directors could not perpetuate their deceptive scheme any longer, as EDS's operations had deteriorated so disastrously that this made it impossible to completely conceal the troubled and deteriorating nature of EDS's business any longer. Thus, beginning in September 2002, in a series of shocking revelations that continued for many months, EDS's top executives and directors admitted that EDS's prior representations of a successful turnaround and its success with the WorldCom and Navy Contracts, as well as repeated forecasts of continued strong growth in revenues, free cash flow and profits, were false and would not be achieved and that EDS's reported financial results for 1999-2002 had been wildly exaggerated.

30.    On September 18, 2002, defendants caused EDS to announce that it expected a $300 million decline in revenues from the same quarter of the prior year and sharply reduced earnings. Defendants also drastically slashed EDS's revenue and profit growth forecasts for 2002-2003, and admitted a $225 million loss in EDS's stock derivative gamble. These stunning revelations came less than one month after EDS's top executives and directors had provided very positive reassurances regarding the Company's 2002-2003 revenue and earnings prospects in a six-city roadshow, telling EDS shareholders EDS was *"on track"* to meet its strong growth forecasts and its business model was *"right on target."* EDS's stock price – which had already fallen due to

criticism of its accounting practices and rumors of problems with large contracts during 2002 – plunged ever further to as low as $11.68 per share.

31.    Meanwhile, during 2001, as EDS's stock price had moved higher and EDS's top executives prepared to cash in on the inflated stock price by exercising their EDS stock options, EDS's Board took steps, as part of the scheme, to avoid dilution of EDS's outstanding shares by secretly entering into a series of derivative contracts on EDS stock. However, as the then-Board knew, this was nothing more than a reckless financial gamble of over $200 million on EDS stock, which would pay off only if EDS stock continued to rise in price – an event the defendants knew was very unlikely to occur, as they knew that EDS was falsifying its financial results to create phony revenues and profits and hide losses, and when this came out, as they knew it inevitably would when EDS's stock cratered in September 2002, EDS lost over $200 million on this derivative gamble – a waste of $200+ million of EDS's assets.

32.    However, the revelations of September 2002 were just the "tip of the iceberg," and EDS's insiders continued to lie to EDS shareholders to conceal the full extent of EDS's problems. Defendants did cause EDS to quickly confess that it was "***rethinking its business strategy***," and was attempting to "***renegotiate***" the huge Navy Contract. In December 2002, EDS settled WorldCom's claims against it for $187 million plus the waiver of certain of EDS's claims against WorldCom in its bankruptcy. EDS wrote down the WorldCom Contract by $118 million. And, in May 2003, defendants announced that EDS had recorded a loss of $334 million due to problems associated with the Navy Contract and disclosed "***significant***" deficiencies in the operational effectiveness of controls over EDS's process to estimate revenue and costs for the contract.

33.    The first admission of inadequate controls was made by defendant Robert H. Swan in a 1Q 04 Conference Call held on May 7, 2003. He stated:

> *Lastly, as part of our overall review of the NMCI account, we and our external auditors reviewed the internal controls for this account and identified certain significant deficiencies in their operation....* [W]e are actively taking steps to improve the operation of the controls for this account, including improvements to the cost estimation process, the assignment of a different financial personnel, and the establishment of a newly staffed program management office.

34.     EDS's SEC filing for 1Q 03, filed on May 15, 2003, in the section on "Controls and Procedures," stated:

> Within 90 days prior to the date of this report, EDS carried out an evaluation of the effectiveness of the design and operation of its disclosure controls and procedures. This evaluation was performed under the supervision and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer.

*     *     *

> Based upon their evaluation, our management, including the Chief Executive Officer and Chief Financial Officer, concluded that, *except as noted below*, our disclosure controls and procedures are effective to ensure that material information relating to EDS and its consolidated subsidiaries is gathered on a timely basis to be included in our periodic reports.

*     *     *

> As a result of a review of the NMCI Contract completed after the first quarter of 2003, management and the Audit Committee of our Board of Directors discovered deficiencies in the operational effectiveness of controls over the process for estimating revenues and costs for the remaining term of the NMCI Contract. Our independent auditors reviewed these matters and advised the Audit Committee that, due to the size of the NMCI Contract, they collectively constitute a significant deficiency that rises to the level of a reportable condition. Our independent auditors have advised management and the Audit Committee that this reportable condition does not constitute a material weakness. *Management has implemented and continues to implement measures to correct and improve the effectiveness of the internal controls for this contract*, including the following: increased frequency and scope of operational and financial reviews with senior account and corporate personnel; a newly-staffed program management office; stricter adherence to the process for approval of change orders; reorganization of account support functions and the appointment of a senior service delivery executive; assignment of additional finance and legal staff to the account; improvements in monitoring and reporting seat deployment; and improved communication with senior client representatives.

- 21 -

35.    In EDS's SEC filing for 1Q 04, filed on May 10, 2004, EDS made the following

statements:

> Breakdown in our internal controls and procedures could have a material
> adverse effect on us. Breakdowns in our internal controls and procedures could have
> a material adverse effect on us. During the third quarter of 2003, we adopted EITF
> 00-21 on a cumulative basis as of January 1, 2003. Prior to the adoption of EITF 00-
> 21, the NMCI contract was accounted for on a percentage-of-completion basis.
> Following the first quarter of 2003, we reported the existence of deficiencies in the
> operational effectiveness of controls over the process for estimating revenues and
> costs over the remaining term of the NMCI contract. Our independent auditors had
> reviewed such deficiencies and advised our audit committee that, due to the size of
> the NMCI contract, they collectively constitute a significant deficiency that rises to
> the level of a reportable condition. *This deficiency was subsequently remediated by
> management in 2003*. We recently identified another example of deficiencies in the
> operational effectiveness of those controls. *In April 2004, our management learned
> of errors in the contract's percentage-of-completion accounting models with
> respect to the last two quarters of 2002.... In addition, in April 2004 management
> became aware that our purchasing process on the contract does not enable
> efficient vendor management and payable processing. This inefficient process
> resulted in the usage of capital of approximately $50 million in excess of
> previously expected amounts in the first quarter.*

36.    In the same filing for 1Q 04, filed on May 10, 2004, it stated in pertinent part in the

section on "Controls and Procedures:"

> As a result of a review of the NMCI contract completed after the first quarter of
> 2003, management and the Audit Committee of our Board of Directors discovered
> deficiencies in the operational effectiveness of controls over the process for
> estimating revenues and costs for the remaining term of the NMCI contract that,
> collectively, constituted a significant deficiency that rose to the level of a reportable
> condition.... Management implemented measures to correct and improve the
> effectiveness of the internal controls for this contract during 2003.... In April 2004,
> management identified a significant deficiency in the NMCI contract's purchasing
> and accrual process associated with certain hardware and subcontractor work-in-
> progress during 2003. This deficiency resulted in the untimely recognition of the
> purchase of certain hardware and assets under construction and is also considered to
> be a reportable condition due to the size of the NMCI contract.

37.    During 2003-2004, while EDS's insiders continued to try to minimize the true extent

of the unfolding disaster, the full extent of catastrophic failure of the attempted turnaround of EDS

became evident. *Unable to renegotiate the Navy Contract, defendants caused EDS to admit to*

- 22 -

*having suffered a loss of $1.6 billion on the contract – a loss that continues to grow even now*! As the Company's incompetence and impaired financial condition continued to come out, its ability to sign new IT management contracts imploded – as large companies like Proctor & Gamble, McDonald's, Dow Chemical and Sears refused to contract with EDS. Certain other contracts were terminated with EDS paying financial penalties, including a $200 million expense related to the Dow Chemical contract. GM, EDS's former parent, recently announced it will terminate its contract with EDS and seek other, more cost-effective suppliers. EDS's problems went well beyond the Navy Contract fiasco. EDS suffered a significant loss on the Baylor Health Care System contract, which it could not perform, and a $100 million loss on a contract with Dow Chemical. EDS also lost a $6-$7 billion multi-year contract to run the United Kingdom's Inland Tax IT system when it came out that EDS's blundering performance had created a fiasco over the English child tax credit, widespread late payment of tax credits and refunds and the likely overpayment of some $3-$4 billion in refunds. EDS fired over 5,000 employees during 2003. *In October 2003, EDS reported a gigantic loss of $1.7 billion, all but wiping out its previously reported 2001-2002 profits – profits upon which EDS executives' multi-million-dollar bonuses had been based – and restated its previously reported financial results to eliminate $2.4 billion in previously reported profits*! As a result of this financial implosion, EDS's free cash flow plummeted, forcing it to borrow over $1.1 billion – raising its total debt burden to over $4.4 billion. At the same time, Moody's was slashing EDS's credit rating – *finally to junk bond status* "with negative implications" – which costs EDS millions of dollars of increased borrowing costs each year and also required it to make hundreds of millions of dollars of accelerated payments to certain customers based on contract provisions. Then, in the 4Q 03, EDS took another $559 million charge on the Navy Contract. Recently, it has been reported

- 23 -

that EDS is withholding or slowing down payments to its suppliers to try to save cash, and is going

to fire up to another 20,000 employees!

38.     The February 11, 2004, *Dallas Morning News* reported that defendant Michael H.

Jordan said the following:

> ***The company [I] joined last year was disorganized ...,*** " Mr. Jordan said.

> As a former executive of Frito-Lay, a long-time EDS client, Mr. Jordan
> expected the computer services giant to be more disciplined and efficient.

> "***Shocked would be the word, because I remember the old days," Mr.
> Jordan said.  "This wasn't the EDS I knew***."

39.     In EDS's July 28, 2004 release announcing its poor 2Q 04 results, Jordan stated:

> "EDS remains a tale of two cities," said Chairman and CEO Mike Jordan....
> "***[W]e continue to be burdened by the cleanup of past problem contracts, as
> exhibited by our lower cash flow guidance on Navy and the charge this quarter to
> terminate the company's 'other commercial contract.***'"

40.     The February 6, 2004, *Dallas Morning News* reported that Swan and Jordan admitted:

> ***Last spring, EDS identified about 12 "problem contracts," including the
> Navy deal, that were failing to meet expectations***.

> \*       \*       \*

> Mr. Jordan said he and other executives have reorganized the company ....

> "We've changed almost everything about our sales process in the last six to
> nine months," he said.

41.     The August 3, 2004, *Dallas Morning News* reported:

> ***Fixing EDS feels like dragging a ball and chain through a 100-year dash,
> [Jordan] said.  The ball and chain represented two things – the company's money-
> losing, operationally nightmarish contract with the U.S. Navy and the scathing
> criticism from credit-rating agencies***.

> Those problems alone are enough to turn a sprint into a limp.  But imagine
> you're Mr. Jordan, also having to finish the race with:

> \*Your hands tied behind your back.  When Mr. Jordan joined EDS in March
> 2003, Moody's Investors Service had already downgraded the company's long-term

- 24 -

debt twice in three months, making it tougher to obtain the fresh capital often required to start work on big contracts.

> *With that handicap, Mr. Jordan hasn't been able to compete for contracts on a level playing field. And Moody's and other credit agencies have cited EDS' competitive disadvantage as a major factor in credit downgrades after Mr. Jordan took over as CEO.*

\*      \*      \*

"The headlines related to the Navy Contract start to reflect on other parts of the business," said Rod Bourgeois, an analyst with Sanford Bernstein. *"That hurts morale and helps competitors, when they're facing EDS at the bidding table, have ammunition against EDS. A lot of these Navy problems have collateral damage."*

42.     Jordan told *Forbes* magazine in October 2004 that, although EDS invented the business of outsourcing, overhauling other firms' computer systems and running them far more efficiently, its own internal network was a haphazard and disjointed mess when he arrived. "'My PC remote access – I've never seen anything that bad.'" According to the October 2004 *Forbes* article, it was indicative of the state of the entire $20 billion Company – chaotic and diffuse. Jordan, told *Forbe* "'[i]t was a holding company. It was 2,000 separate companies with a financial overlay to it.'" Big accounts were called on by up to 22 different EDS departments. The firm was losing big deals to competitors because it could not price them right and was entering into contracts that could not possibly turn a profit. *"'To say I was shocked would be a mild understatement,'"* Jordan told *Forbes.* *"'I knew this company, and I knew the founders. This was the Marine Corps .... But when I came here it was the Girl Scouts.'"*

43.     Jordan also discovered that during the Relevant Period, many of EDS's problems related to meeting commitments under big contracts arose out of EDS's practice of permitting sales representatives to design products and services based on what the customer wanted, without consulting the technicians who were going to do the work. EDS's competition, IBM, Hewlett-Packard and Accenture, are still out-selling EDS and openly acknowledge EDS's internal flaws.

44.     In January 2003, Daley was pushed out as CFO, *i.e.*, "kicked upstairs" to a cushy job. In March 2003, Brown was pushed out as CEO. Frederick was pushed out as executive vice president in May 2003. However, ***none of them were fired for cause, despite the grotesque misperformance of their jobs***. This allowed them to retain huge amounts of prior payments and bonuses and to pocket retirement and/or severance benefits worth millions. Brown alone – the main architect of this disaster – got $31 million. EDS's Board did this to buy their silence and cooperation in not exposing the complicity of the EDS Board in this disaster – in effect, "hush" money was paid to hew to the EDS party line and not "tattle" on the directors. While Brown, Daley, Heller and Frederick were put out of the Company as sacrificial lambs (or kicked upstairs), EDS's directors orchestrated their departures to assure that they would be cooperative. The few EDS executives who have been put out as scapegoats by the Board over the past few years have been well taken care of, as the Board members, wishing to cover up their own participation and wrongdoing, have allowed them to leave with millions of dollars and have wrongfully indemnified them against liability for their prior wrongful conduct. Normally, when a corporation encounters this type of disaster, which includes accounting irregularities and SEC investigations, the Board arranges an independent investigation of the events to determine what went wrong and who did/knew what. EDS's Board did not do this. As a result of their continuing concealments and cover-up, several – a majority – of the directors of EDS have held onto their positions of power, prestige and profit at the Company.

45.     The result of EDS's 1999-2003 fiasco has been one of the most shocking exposures of fraud, deception, mismanagement, unjust enrichment and failed directorial oversight in U.S. corporate history. Defrauded investors and employees have sued EDS in massive class action suits which are costing many millions of dollars to defend and which have exposed EDS to billions of dollars in potential liability. In addition, EDS is subject to governmental and regulatory

investigations, including investigations by the SEC and the Department of Justice ("DOJ"), which are costing millions of dollars to defend and which will ultimately result in large fines and/or penalties. Moody's has downgraded EDS's credit rating to junk status. Also, because of the damage to EDS's reputation and goodwill, its stock trades at a substantial discount to the stocks of its peer group competitor companies and is likely to suffer from what is known as the *"liar's discount"* going forward, making it much more difficult for EDS to access the capital markets or to use its stock as acquisition currency.

46.     While EDS and its public shareholders have suffered great damage due to the deceit and deception and breaches of duty by EDS's insiders and the oversight failings of EDS's Board, EDS insiders and directors have *profited from their participation in the illegal conduct*. The managers of EDS pocketed millions of dollars of salaries and bonuses during 2000-2002 that would have been denied them had the truth been disclosed, while EDS's Board members have pocketed large fees and enjoyed other benefits to which they were not entitled due to their breaches of duty.

47.     EDS's Board knew or recklessly disregarded that the Company's bonus compensation plans created strong incentives and the opportunity for EDS's top executives to manipulate and falsify EDS's financial results to create profits to trigger huge bonus payments and stock benefits to themselves. Yet the EDS Board took no action to safeguard against such abuse or to even test or evaluate EDS's existing internal accounting and financial controls to determine if they were sufficient to prevent such abuse.

48.     Via passage and implementation of the Sarbanes-Oxley Act of 2002, the U.S. Congress mandated that public companies like EDS that are subject to SEC regulation take action to increase and then maintain the increased effectiveness of their internal disclosure, financial and accounting controls to prevent misstated financial information, fraudulent conduct and the waste of

corporate assets. These requirements reflect a policy of full and accurate disclosure of the federal government and were intended to improve corporate governance and to decrease the possibility of directorial or management misconduct, thus increasing management accountability, while safeguarding corporate assets and shareholder value.

49.     During the Relevant Period, Brown, as Chairman and CEO, Daley, as Chief Financial Officer, Swan as Executive Vice President/CFO and Jordan as Chairman and CEO, signed and filed and/or distributed false certifications they were required to sign pursuant to the Sarbanes-Oxley Act on behalf of themselves and EDS relating to EDS's 3Q 02 Form 10-Q, FY 2002 Form 10-K, Forms 10-Q for the 1Q, 2Q and 3Q of 2003, and FY 2003 Form 10-K. These certifications falsely stated that those reports were truthful, that the financial statements in them were accurate, that EDS's internal disclosure and accounting controls were designed to be effective to detect and prevent fraud and had been tested and found to be effective, and that the financial reports complied with the U.S. securities laws. True and correct copies of the following Sarbanes-Oxley certifications are attached hereto as Exhibits A–Q:

| Exhibit | Period | Date Signed | Sarbanes-Oxley §302 Certification Signed by: | Sarbanes-Oxley §906 Certification Signed by: |
|---------|--------|-------------|-----------------------------------------------|-----------------------------------------------|
| A | 3Q 2002 | 11/13/02 | Brown | |
| B | 3Q 2002 | 11/13/02 | Daley | |
| C | FY 2002 | 3/12/03 | Brown | |
| D | FY 2002 | 3/12/03 | Swan | |
| E | 1Q 2003 | 5/15/03 | Jordan | |
| F | 1Q 2003 | 5/15/03 | Swan | |
| G | 1Q 2003 | 5/15/03 | | Swan |
| H | 1Q 2003 | 5/15/03 | | Jordan |
| I | 2Q 2003 | 8/13/03 | Swan | |
| J | 2Q 2003 | 8/13/03 | Jordan | |
| K | 2Q 2003 | 8/13/03 | | Jordan and Swan |
| L | 3Q 2003 | 11/13/03 | Jordan | |
| M | 3Q 2003 | 11/13/03 | Swan | |
| N | 3Q 2003 | 11/13/03 | | Jordan and Swan |
| O | FY 2003 | 3/15/04 | Jordan | |
| P | FY 2003 | 3/15/04 | Swan | |
| Q | FY 2003 | 3/15/04 | | Jordan and Swan |

50.     Each of these certifications was false as the financial statements were false and EDS's internal disclosure and accounting controls were then ill-designed, had not been adequately tested and were not effective.  EDS's top executives and directors during 2000-2003 deliberately or recklessly allowed EDS's internal financial and accounting controls to be deficient and defective. Prior and subsequent to the enactment of the Sarbanes-Oxley Act, EDS's internal financial, accounting and disclosure controls were grossly insufficient to assure compliance with GAAP, assure truthful and full disclosure by EDS to its shareholders or investors and to protect and avoid the waste of EDS's assets.

51.     The fraudulent manipulation and inflation of EDS's reported financial results during the Relevant Period was only possible because of gross deficiencies in EDS's internal financial, disclosure and accounting controls, which EDS's top executives and directors knew or recklessly disregarded were in clear violation of Sarbanes-Oxley after the effective date.  EDS has, in fact, admitted that there are "*material weaknesses in internal controls*."  As recently as April 2004, EDS

was still finding significant deficiencies in control procedures for the Navy Contract, which resulted in the improper accrual of revenues on the contract and excessive capital outflows causing Jordan to lament "our cash flow surprises were all out of Navy. The first one came in the first quarter where there was almost $100 million of unaccrued payables. How that could be, I don't know."

52.     These gigantic losses have decimated EDS's shareholder equity and its market capitalization, as shareholders watched as EDS's stock suffered a sickening decline from which it has never recovered. The attached fold-out chart shows the collapse of EDS's stock:

# Electronic Data Systems Corp.
## Daily Prices From: January 4, 1999 to September 20, 2004



Copyright © 2004 by William S. Lerach and Lerach Coughlin Stoia Geller Rudman & Robbins LLP.  William S. Lerach and Lerach Coughlin Stoia Geller Rudman & Robbins LLP will vigorously defend all of their rights to this writing/publication.

(1) Goldman Sachs Technology Services (GSTS) Index price was indexed to EDS's closing common stock price on 10/26/2000.

(2) Standard & Poor's 500 (S&P 500) Index was indexed to EDS's closing common stock price on 01/04/1999.

53.     As a result of the personal involvement of a majority of the current directors of EDS in the alleged wrongdoing and the involvement by the current Chairman/CEO (Jordan), President/COO (Heller) and current CFO (Swan) of the Company in at least some aspects of the alleged wrongdoing, the EDS Board will not, as it has not to date, take action to sue EDS's present and former Board members and top executives, including themselves, in an attempt to remedy the damage defendants' misconduct has already inflicted and will in the future inflict upon EDS. Under such circumstances, any request or demand from the directors of this Company to institute this legal action would be futile and is thus excused, so that this derivative action brought by shareholders of a public company must proceed.

54.     Thus, the named plaintiff, a shareholder of this public Company, sues the past and current directors and officers of the Company named as defendants herein for their illegal conduct in connection with this disaster. This suit – pursued derivatively – seeks to obtain legal and equitable relief in the form of monetary damages, injunctive relief, and corporate governance changes not only to compensate EDS for this wrongdoing, but also to better protect this public Company and its shareholder community from a recurrence of such defalcations in the future.

## JURISDICTION AND VENUE

55.     Nominal Party EDS is a Delaware corporation with its executive offices located in Plano, Texas. EDS is being sued in class action suits for violation of the U.S. securities laws and the U.S. ERISA statute in connection with the actions of its executives and directors to falsify EDS's financial statements in this district. Certain of the Individual Defendants reside in this district and KPMG has offices in this district. A majority of the wrongdoing occurred and/or had effect in this district.

56.     This Court has jurisdiction over all claims asserted herein pursuant to: (a) 28 U.S.C. §1332, as the amount in controversy – millions and millions of dollars – is in excess of the jurisdictional minimum of this Court. The plaintiff is a citizen and resident of a state in the United States different from defendants. Complete diversity of jurisdiction is present.

57.     Venue is proper in this District because EDS has its principal place of business in this district and many of the violations of applicable law occurred in and the false and misleading statements were made in or issued from this district. Plaintiff's causes of action arose in this district and EDS has suffered and will continue to suffer harm in this district. Moreover, each defendant has extensive contact with Texas, including Individual Defendants Daley, Swan, Frederick, McMann, McCain and Todd, who reside in this district.

# THE PARTIES

**Plaintiff**

58.     Plaintiff Alaska Electrical Pension Fund is a stockholder of EDS. This plaintiff is a resident and citizen of the states where its Trustees reside, which does not include any state in which a named defendant resides or is a citizen of. This plaintiff currently owns over 73,000 shares of EDS.

**Nominal Party**

59.     Nominal Party EDS is a corporation which, *inter alia*, provides customers with IT outsourcing services. EDS was incorporated in Delaware in 1996 and its executive offices are located at 5400 Legacy Drive, Plano, Texas.

**Individual Defendants**

60.     (a)     Defendant Richard H. Brown ("Brown") served as Chairman and CEO of EDS from January 1999, until his termination by the Company in March 2003. On February 12,

2001, Brown sold 50,000 shares of EDS common stock for nearly $3.2 million in proceeds. Brown is a citizen of Texas and may be served at 3510 Turtle Creek Blvd., #12B, Dallas, Texas.

(b)     Defendant James E. Daley ("Daley") served as Executive Vice President and Chief Financial Officer ("CFO") of EDS from January 1999 until he was demoted to Executive Vice President of Client Solutions, Global Sales and Marketing on February 10, 2003, a position he held until his termination on July 31, 2003. Daley is a citizen of Texas and may be served at 5220 Sky Lake Drive, Plano, Texas.

(c)     Defendant Douglas L. Frederick ("Frederick") is a citizen of Texas. He was the Executive Vice President in charge of EDS's IT outsourcing business from 1999 through May 2003. Frederick is a citizen of Texas and may be served at 3900 Wood Lake Drive, Plano, Texas.

(d)     Defendant Jeffrey M. Heller ("Heller") was President and Chief Operating Officer of EDS from 1996 to November 2000 and Vice Chairman and Chief Operating Officer of EDS from November 2000 to February 2002. From March 2003 to current, Heller has been President, Chief Operating Officer and a director of EDS. Heller is neither independent nor disinterested. Heller is a citizen of Texas and may be served at 4416 Lakeside Drive, Dallas, Texas.

(e)     Defendant William H. Gray III ("Gray") was a director of EDS from 1997 until April 2004. Gray served on the Compensation Committee of EDS's Board during 1999-2003. Gray is neither independent nor disinterested. Gray is a citizen of Virginia and may be served at 2084 Hunters Crest Way, Vienna, Virginia.

(f)     Defendant William M. Daley ("William Daley") became a director of EDS in 2001 and served as a member of EDS's Governance Committee during 2001. William Daley is a citizen of Illinois and may be served at 1740 North Clark Street, Apt. 1718, Chicago, Illinois.

(g)     Defendant Ray L. Hunt ("Hunt") has been a director of EDS since 1996. He served as a member of EDS's Audit Committee from 1999-2003. Hunt is neither independent nor disinterested. Hunt is a citizen of Texas and may be served at 5915 Steuben Court, Dallas, Texas.

(h)     Defendant Ray J. Groves ("Groves") has been a director of EDS since 1996. He served as a member of EDS's Audit Committee from 1996-2003, and served on its Compensation Committee from 1996-2002. Groves is neither independent nor disinterested. Groves is a citizen of Connecticut and may be served at 1566 Ponus Ridge, New Canaan, Connecticut.

(i)     Defendant Roger A. Enrico ("Enrico") became a director of EDS in 2000, was on the Audit and Governance Committees from 1999-2003 and 2001-2003, respectively. Enrico is neither independent nor disinterested. Enrico is a citizen of Texas and may be served at 3831 Turtle Creek Blvd., Apt. 23B, Dallas, Texas.

(j)     Defendant C. Robert Kidder ("Kidder") has been a director of EDS since 1996. He served on the Compensation Committees of EDS's Board from 1996-2003. Kidder is neither independent nor disinterested. Kidder is a citizen of California and may be served at 900 Knollwood Drive, Santa Barbara, California.

(k)     Defendant James A. Baker III ("Baker") was a director of EDS from 1996 until December 2003. He served on the Governance Committee of EDS's Board until 2003. Baker is a citizen of Texas and may be served at 500 Little John, Houston, Texas.

(l)     Defendant Judith Rodin ("Rodin") has been a director of EDS since 1996 and a member of the Compensation and Governance Committees during 2003 and 1996-2003, respectively. Rodin is neither independent nor disinterested. Rodin is a citizen of New York and may be served at 124 East 30th, New York, New York.

- 35 -