(m)     Defendant Michael H. Jordan ("Jordan") has been the Chairman and CEO of EDS since March 2003. He is neither independent nor disinterested. Jordan is a citizen of Texas and may be served at 3831 Turtle Creek Blvd., Apt. 14C, Dallas, Texas.

(n)     Defendant Robert H. Swan ("Swan") has been the CFO of EDS since early 2003. Swan is a citizen of Texas and may be served at 5237 Runnin River Drive, Plano, Texas.

(o)     Defendant Fred G. Steingraber ("Steingraber") serves as the Chairman and CEO of A.T. Kearney, a high-value management consultancy which became a subsidiary of EDS in August 1995. On November 10, 1999, Steingraber sold 60,440 shares of EDS stock for $3.9 million in proceeds. Steingraber is a citizen of Illinois and may be served at 615 Warwick Road, Kenilworth, Illinois.

61.     Defendant John W. McCain ("McCain") served as head of EDS's CIO Services until July 1999 when McCain was promoted to head of EDS's E.Solutions unit, a group of six EDS business divisions pegged by then CEO Brown as key to the Company regaining its lead from IBM Global Services. E.Solutions was EDS's fastest growing group in 2001. McCain had joined EDS in 1986 and served in a variety of capacities. McCain suddenly resigned without explanation in April 2002. On February 12, 2001, McCain sold 8,888 shares of EDS stock for $566,000 in proceeds and on November 16, 2001, McCain sold 25,100 shares of EDS stock for $1.7 million in proceeds. McCain is a citizen of Texas and may be served at 3621 Twin Lakes Way, Plano, Texas.

62.     Defendant Kim L. McMann ("McMann") served as president of EDS's State Business and of the State Health Care strategic business unit until she was promoted to President of EDS's Business Process Management unit in September 1999. McMann had been employed with EDS since 1979. Between December 11, 2001 and December 12, 2001, McMann sold 14,448 shares

of EDS stock for nearly $2.1 million in proceeds. McMann is a citizen of Texas and may be served at 1708 Windermere Drive, Plano, Texas.

63.    Defendant Troy Todd ("Todd") was brought in by defendant Brown in 1999 from Cable & Wireless, where he had worked with Brown, during Brown's "turnaround" effort to serve as EDS's Executive Vice President of Leadership and Change Management. On November 28, 2001, Todd sold 39,712 share of EDS stock for $2.8 million in proceeds. Todd is a citizen of Texas and may be served at 4729 Bull Run Drive, Plano, Texas.

64.    Defendant Paul J. Chiapparone ("Chiapparone") served as Executive Vice President - Operations of EDS from November 2000 until his resignation in January 2003. Prior to that, Chiapparone had served as an Executive Vice President of EDS since June 1996 and a Senior Vice President since April 1986. On February 13, 2002, Chiapparone sold 60,000 shares of EDS stock for $3.6 million in proceeds. Chiapparone is a citizen of Texas and may be served at 2045 Mason Drive, Frisco, Texas.

65.    The defendants named in ¶¶60-64 served as an officer and/or director of EDS during the Relevant Period and are referred to collectively as the "Individual Defendants." The Individual Defendants named in ¶¶60(d), (g), (h), (i), (j), (l) and (m) are current members of the EDS Board of Directors as of the filing of this Complaint and are referred to collectively as the "Director Defendants."

**The Directors' and Officers' Duties**

66.    Each officer and director of EDS owed EDS or its shareholders the duty to exercise a high degree of care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of EDS's directors and officers complained of herein involves oppression and fraudulent misconduct – a knowing, intentional and culpable violation of their obligations as officers/directors of EDS and the

- 37 -

absence of good faith on their part for their duties to the Company and its shareholders. The misconduct of the EDS officers has been ratified by EDS's Board, which has failed to take any legal action on behalf of the Company against them.

67.     The Board of Directors of EDS is, under EDS's corporate structure, directly and intimately involved in the oversight of EDS's business.

68.     The Audit Committee of EDS's Board is responsible for oversight of the reliability and integrity of the accounting principles and practices, financial reporting, and disclosure practices of EDS. The Audit Committee also has oversight responsibility to ensure that EDS has established adequate systems of internal controls and maintains practices and processes to ensure compliance with applicable laws, including Sarbanes-Oxley.

69.     By reason of their positions as officers, directors and/or fiduciaries of EDS and because of their ability to control the business and corporate affairs of EDS, the Individual Defendants owed EDS and its shareholders fiduciary obligations of candor, trust, loyalty and care, and were required to use their ability to control and manage EDS in a fair, just, honest and equitable manner, and to act in furtherance of the best interests of EDS and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, projections and forecasts, so as to (i) fulfill their duty of candor and honesty to the existing shareholders of EDS; and (ii) so that the market price of EDS stock would be based on truthful and accurate information.

70.     The Individual Defendants, because of their positions of control and authority as directors or officers of EDS, were able to and did, directly and indirectly, control the wrongful acts

complained of herein, including EDS's violations of the U.S. securities laws, and issuance of the various false and misleading public statements issued by the Company to its shareholders and to the investment community. Because of their executive and directorial positions with EDS, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations and future business prospects of EDS and was required to disclose them promptly and accurately to its shareholders and the financial markets but did not do so.

71. To discharge their duties, the directors of EDS were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the business and financial affairs of EDS. By virtue of such duties, the officers and directors of EDS were required, among other things, to:

(a) Manage, conduct, supervise and direct the business affairs of EDS in accordance with law (including the U.S. securities laws and Sarbanes-Oxley), government rules and regulations and the charter and bylaws of EDS;

(b) Neither violate nor knowingly permit any officer, director or employee of EDS to violate applicable laws, rules and regulations;

(c) Remain informed as to the status of EDS's operations, including the performance of its long-term controls, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the U.S. federal securities laws and their duty of candor to its shareholders;

(d) Establish and maintain systematic and accurate records and reports of the business and affairs of EDS and procedures for the reporting of the business and affairs to the Board

of Directors and periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    Maintain and implement an adequate, functioning system of internal legal, financial and accounting controls, such that EDS's financial statements would be accurate and the actions of its directors would be in accordance with all applicable laws;

(f)    Exercise reasonable control and supervision over public statements to the securities markets and trading in EDS stock by the officers and employees of EDS; and

(g)    Supervise the preparation and filing of any financial reports or other information required by law from EDS and examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of EDS and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

72.    During all times relevant hereto, each of the defendants occupied a position with EDS or was associated with the Company in such a manner as to make him or her privy to confidential and proprietary information concerning EDS and its operations, finances and financial condition. Because of these positions and such access, each of the defendants knew that the true facts specified herein regarding EDS's business and finances had not been disclosed to and were being concealed from its shareholders and the public. The Individual Defendants, as corporate fiduciaries entrusted with non-public information, were obligated to disclose material adverse information regarding EDS and to take any and all action necessary to ensure that the officers and directors of EDS did not act upon such privileged non-public information in a manner which caused the Company to violate the law. Because of the defendants' positions, they knew the adverse non-public information about EDS's operations and finances, as well as its accounting practices, markets and business prospects, via access to internal corporate documents (including EDS's financial statements, operating plans,

- 40 -

budgets and forecasts and reports of actual operations), conversations and connections with other corporate officers and employees, attendance at management and/or board of directors' meetings and committees thereof and via reports and other information provided to them in connection therewith. Each of the defendants participated in the issuance and/or review of false and/or misleading statements, including the preparation of false and/or misleading press releases, SEC filings and reports to EDS shareholders.

**Defendant KPMG**

73.     Defendant KPMG, LLP ("KPMG") was engaged by EDS to provide independent auditing and/or consulting services to EDS, including the preparation, examination and/or review of EDS's consolidated financial statements for FY 1999-FY 2003, which financial statements were disseminated to EDS's shareholders.  As a result of the services it rendered to EDS, KPMG's representatives were frequently present at EDS's corporate headquarters and financial offices between 1999 and 2003 and had continual access to EDS's confidential corporate financial and business information, including EDS's true financial condition, financial statements and percentage-of-completion accounting, which information KPMG was aware of and/or negligently disregarded. KPMG actively participated in the presentation, review and issuance of EDS's false financial statements.  Defendant KPMG issued unqualified audit reports on EDS's 1999-2002 financial statements.  These opinions are attached hereto as Exhibits R-U and incorporated herein by reference.  Defendant KPMG may be served at 717 North Harwood Street, Suite 3100, Dallas, Texas.

## CONCERTED ACTION ALLEGATIONS

74.     Defendants schemed, pursued common courses of conduct, acted in concert with, and aided and abetted one another to accomplish the wrongs complained of herein.

## DERIVATIVE ALLEGATIONS

75.  Plaintiff brings this action, in good faith, derivatively in the right and for the benefit of EDS to redress damage already suffered and damage to be suffered by EDS as a direct result of defendants' breaches of fiduciary duty, corporate mismanagement, unjust enrichment, abuse of control and fraud and for equitable relief as well. This is not a collusive action to confer jurisdiction in this Court which it would not otherwise have. Plaintiff will adequately and fairly represent the interests of EDS and its shareholders in enforcing and prosecuting their rights. Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

76.  The Sarbanes-Oxley Act placed significant additional responsibilities on the boards of directors of public companies subject to the Act, like EDS, to improve corporate financial, accounting and internal controls to improve corporate financial responsibility and disclosure. This new law was a disaster for the EDS Board, as, despite its public posture of concern over good corporate governance, controls, disclosure and integrity, it was sitting atop a massive ongoing scheme to falsify its Company's reported financial results. Any real compliance with Sarbanes-Oxley would have exposed this scheme, brought it to an end and resulted in embarrassing discharges. Thus, the Board of EDS did not enforce or comply with Sarbanes-Oxley, despite its legal obligation under U.S. law to do so. They will not sue themselves for these failures.

77.  Demand upon the Board of EDS that they sue themselves for the damage that their misconduct has caused the Company would be futile and useless, and it is obvious that they will not do so and they have not done so. They have also taken steps to avoid any full and unrestricted investigation of their knowledge or participation in the scheme to inflate the profits of EDS's financial statements and placed in charge of the operations of EDS an individual (Heller) who was deeply involved in the wrongdoing and permitted Jordan and Swan to continue in their positions

- 42 -

despite their filing false Sarbanes-Oxley certifications during 2003. Another reason the directors will not sue themselves is that by suing themselves, these individuals would void any directors' and officers' liability insurance coverage otherwise available to them, as such policies include the so-called "insured vs. insured" exclusion, by which a suit brought by or on behalf of the Company against them would not be covered by the insurance and thus would expose these individuals to ruinous personal liability.

78.     While EDS and its public shareholders have suffered great damage and losses due to the deceit and deception committed by its insiders and the director oversight failings committed by its Board, the insiders and directors of this Company have not only suffered no damages, but, in fact, have greatly profited from their participation in the illegal conduct. These individuals have pocketed millions and millions of dollars of regular and bonus compensation as a result of their incompetent performance and deceptive activities, and the few individual officers who have been fired as scapegoats by the Board wishing to cover up their own participation and wrongdoing have left with millions and millions of dollars of illegally obtained compensation and bonuses.

79.     As a result of their concealments and falsifications, many of the directors and managers of EDS held onto their positions of power, prestige and profit at the Company. The managers of EDS pocketed millions of dollars in salaries and bonuses which would have been denied them had the truth been disclosed. The directors avoided not only the exposure and embarrassment of their oversight failures, but also continued in their prestigious and profitable positions as directors of one of the largest companies in the world.

80.     The EDS Board is still dominated and controlled by wrongdoers who are covering up their own misconduct and will not take action to protect the interests of EDS or its shareholders. The only three directors on EDS's Board who were not personally involved in the alleged wrongdoing

are Richard Fisher, Ellen Hancock and Edward Kangas, each of whom were hand-picked by Jordan for their Board seats. However, Jordan is involved in this wrongdoing, *i.e.,* the after-the-fact cover-up and filing of false Sarbanes-Oxley certificates, and these directors owe their positions and allegiance to Jordan and those Board members who are named as defendants and thus they are neither independent nor disinterested.

81.     The present Board of Directors of EDS has refused, and will continue to refuse, to institute this action for the foregoing and following reasons:

(a)     The majority of the current Board of Directors of EDS (seven of ten directors) participated in the wrongs complained of, they created and approved, authored and signed and circulated the false and misleading financial statements.

(b)     The acts complained of herein constitute violations of fiduciary duties owed by the Board of Directors and these acts are incapable of ratification.

(c)     Certain of the known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, and do, dominate and control the Board of Directors. Thus, the Board could not exercise independent objective judgment in deciding whether to bring or vigorously prosecute this action.

(d)     The acts complained of herein are illegal and fraudulent and thus are acts incapable of ratification.

(e)     In order to bring this action for breach of fiduciary duty, abuse of control and fraud, the members of the Board of Directors would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their good friends and with whom they have entangling financial alliances, interests, and dependencies, which they would not do. They therefore would not be able to vigorously prosecute any such action.

(f)     The members of the EDS Board, including each of the defendants herein, receive substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board and their control of EDS. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action. The Board members also have close personal and business ties with each other and are, consequently, interested parties and cannot in good faith exercise independent business judgment to determine whether to bring this action against themselves.

(g)     The EDS directors' and officers' liability insurance policies for the period 1999-2004 has an "insured vs. insured" exclusion. Thus, if the directors caused the Company to sue its officers and directors for the liability asserted in this case they would not be insured for that liability. They will not do this to themselves or the officers they hired. The directors' and officers' liability insurance was purchased and paid for with corporate funds to protect the Company. This derivative suit does not trigger the "insured vs. insured" exclusion, and thus only this derivative suit can obtain a recovery on the directors' and officers' liability insurance and benefit the Company.

(h)     Jordan, as CEO and Chairman, and Heller, as President and Chief Operating Officer, are inside directors of EDS, and their principal professional occupations are their employment with EDS, pursuant to which they received and continue to receive substantial monetary compensation and other benefits. Specifically, Jordan's contract provides a $1 million base salary with a targeted annual bonus of 35% of base salary, consisting of a cash component of 40% (or $540,000) which may increase up to 313% of that amount and a stock option component. Defendant Heller's employment contract provides for a base salary of $700,000 per year with a targeted annual bonus of $862,323, consisting of a cash component of not less than $344,933, which

may increase up to 313% of that amount.  Accordingly, defendants Heller and Jordan are beholden to the other members of the Board to maintain their employment with EDS, rendering them incapable of impartially considering a demand to commence and vigorously prosecute this action.

(i)     Defendant Directors Groves, Hunt and Enrico were, during the relevant period, members of the Audit Committee.  The Audit Committee is responsible for reviewing the quality and adequacy of EDS's internal financial controls and internal audit staff.  The Audit Committee also reviews the Company's annual and quarterly financial statements and programs established to monitor compliance with its Code of Conduct.   In fulfilling its oversight responsibilities, the Audit Committee reviewed the audited financial statements in the Annual Report with management, including a discussion of the quality, not just the acceptability, of the accounting principles, the reasonableness of significant judgments, and the clarity of disclosures in the financial statements.  Nonetheless, the Audit Committee caused or allowed the improper actions described above.  By such actions, defendants Grove, Hunt and Enrico breached their duties to EDS.  As a result of the defendants' breach of these duties, any demand upon them would have been futile.

(j)     A majority of EDS's Board of Directors and senior management participated in the wrongs complained of herein.  A majority of EDS's directors are not disinterested or independent due to the following:  Defendants Rodin, Gray, Groves, Enrico, Kidder, Jordan and Heller served on the EDS Board during the Relevant Period and were directly privy to all relevant information concerning the Navy Contract.  Pursuant to their specific duties as Board members, each of the defendants was charged with the management of the Company and to conduct and manage its business affairs.  Nonetheless, each of the above-referenced defendants breached the fiduciary duties that they owed to EDS and its shareholders in that they failed to prevent and correct the improper percentage-of-completion accounting.  Thus, a majority of the EDS Board cannot exercise independent

- 46 -

objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions which have subjected EDS to millions of dollars in liability for possible violations of applicable securities laws.

(k)     The Compensation and Benefits Committee of the Board establishes the compensation of EDS executive officers and reviews recommendations made by the CEO with respect to the long-term incentive compensation of other corporate officers. The Compensation and Benefits Committee also overseas the Company's employee benefits plans, reviews new employee benefits plans and significant amendments to existing plans, and administers all stock-based plans. The Compensation and Benefits Committee is also responsible for the establishment and administration of the compensation programs for EDS executives, including the CEO Jordan and President Heller. In fulfilling these responsibilities, the Compensation and Benefits Committee establishes and administers the compensation for the Company's executives, including approving adjustments to base salary, establishing targets for the payment of annual bonuses, vesting of stock-based awards and granting long-term incentive compensation. The Compensation and Benefits Committee was comprised of defendants Gray, Kidder, Groves and Rodin during the Relevant Period. As the members of the Compensation and Benefits Committee control the other defendants' compensation and stock awards, the remaining members of the Board will not institute this action against defendants Kidder, Gray, Groves or Rodin. To do so would jeopardize each defendant's personal financial compensation. Thus, demand on defendants Heller, Jordan or Enrico would have been futile.

(l)     Directors Rodin, Jordan, Gray, Groves and Kidder permitted defendants Brown, Daley and Frederick to be terminated *without cause and not for cause*, thereby permitting them to receive to the detriment of the Company severance packages valued in excess of $40 million despite their knowledge of those persons' participation in the wrongdoing alleged herein.

- 47 -

(m)     The Company's current directors, because of their inter-related personal business and professional relationships, among themselves and with defendants Brown and Baker, have developed debilitating conflicts of interest which prevented the Board members of the Company from taking the necessary and proper action requested herein on behalf of the Company. The majority of the Board, including the defendants listed below, are subject to the following prejudicial entanglements:

(i)     **Enrico and Jordan Are Long-Time Associates**:  Enrico, former PepsiCo CEO, had known Jordan since the 1990s when Jordan ran PepsiCo's Frito-Lay unit and Enrico was instrumental to bringing Jordan on as EDS's CEO.

(ii)     **Hunt and Enrico Are Long-Time Associates**:  Defendant Hunt is currently a director of PepsiCo, where defendant Enrico served as a director from 1987 to May 2003 and as CEO from 1996-2001.  Defendants Hunt and Enrico co-chaired the National Multiple Sclerosis Society Fourth Annual Dinner of Champions on September 16, 2002.  Defendants Hunt and Enrico were both at the President's State Dinner for Mexican President Vicente Fox on September 5, 2001.  Defendants Hunt and Enrico are both members of the Dallas Citizen's Council, where they both contributed $1,000 or more to the campaign of Ron Kirk for Mayor in 1995. Moreover, defendants Hunt and Enrico were members of the committee that drove the two-year fundraiser, called Fund for Molecular Research, which raised $156.4 million for the University of Texas Southwestern Medical Center at Dallas.  Because of their long-standing and entangling personal, business and professional relationships, neither defendant Hunt nor defendant Enrico would have taken the action requested by plaintiff herein against one another or the remainder of the defendants.

(iii)      **Gray and Enrico Are Long-Time Associates**: Defendant Enrico was elected as a director of the United Negro College Fund ("UNCF") in March 1995, at which time defendant Gray was the President and CEO. Because of their long-standing and entangling personal, business and professional relationship, neither defendant Gray nor defendant Enrico would have taken the action requested by plaintiff herein against one another or the remainder of the defendants.

(iv)      **Gray and Rodin Are Long Time Associates**: Defendants Gray and Rodin were appointed as members of the National Infrastructure Assurance Council in January 2001. Because of their long-standing and entangling personal, business and professional relationship, neither defendant Gray nor defendant Rodin would have taken the action requested by plaintiff herein against one another or the remainder of the defendants.

(v)      **Daley and Enrico Are Long-Time Associates**: Defendant Enrico was appointed as a Senior Member of the Conference Board, Inc., in December 1996. At the same time, defendant Daley was re-elected as a regular member. Because of the long-standing and entangling personal, business and professional relationship, defendant Enrico would not have taken the action requested by plaintiff herein against Daley or the remainder of the defendants.

(vi)      **Jordan and Gray, the CEO of UNCF, Are Long Time Associates and EDS Is a Large Benefactor of UNCF:** Current Chairman and CEO Jordan is also the Chairman of the Board of Directors of UNCF. Gray is the longtime UNCF CEO and President. EDS is a large benefactor of UNCF. According to a December 5, 2000 article in *Business Wire*, UNCF announced EDS would provide UNCF students with the opportunity to purchase computers and peripherals through a newly created E-Commerce site that offers highly discounted technology equipment, including PCs, printers and other Internet-related products. Moreover, through UNCF's Technology Enhancement Campaign, EDS developed an E-commerce site for UNCF to facilitate

reduced pricing for hardware and software offered by UNCF partners.  The site also drives interactive philanthropy for UNCF by accepting and processing secure credit card donations.  The in-kind donation from EDS had an estimated value of $306,000.  The December 5, 2000 *Business Wire* report also stated that since March 2000, EDS had supported UNCF's technology enhancement capital campaign with $4 million in technology improvements for Texas-based schools.  "'EDS is pleased to support the UNCF's Technology Enhancement Capital Campaign,'" said defendant Brown.  "'EDS has been a long-standing supporter of the UNCF and we are deeply appreciative for its help in our aggressive efforts to close the existing digital divide,'" said Gray, UNCF's CEO and President and EDS Board member.

(vii)      **Hunt and Heller Are Long-Time Associates**: Defendants Hunt and Heller both serve on the Board of Trustees of the Southwestern Medical Foundation.

(viii)      **Brown and Hunt Are Long-Time Associates**:  Defendants Brown and Hunt both served on the EDS Foundation which was chartered in January 2000 and was funded with EDS stock and cash valued at $11 million.

(ix)      **Jordan and Rodin Are Long-Time Associates**: Defendants Jordan and Rodin, the President of the University of Pennsylvania ("Penn"), are longtime associates and EDS is a benefactor of Penn.  Rodin and Jordan also both serve on the Board of Aetna, Inc. and are Trustees for the Brookings Institute.  Rodin depends on her directorships of corporate boards to supplement her income as the President of Penn.  The *Fort Worth Star Telegram* (April 24, 2003) reported that Rodin earned more than $196,000 for her work on several corporate boards (including EDS) in 2001 as well as from stock options and shares.  She also received an additional $52,000 in deferred compensation for serving on the AMR board and more than $50,000 worth of travel on American Airlines.  On June 4, 2002, EDS announced that it had donated product life-cycle

management software from its PLM Solutions line of business to Penn. "'Our partnership with Penn's MEAM Department adds a whole new dimension to engineering and technology education,' said Hulas King, director of Global Strategic Partnerships, EDS PLM Solutions.... 'We are proud to team with Penn's strong academic leaders and gifted students in improving manufacturing in the greater Philadelphia area and beyond,'" said EDS's King.

(x)     **Rodin and Heller Are Long-Time Associates**:  In March 1998, Trammell Crow Company signed a $13 million outsourcing contract with Penn, giving it the right to manage Penn's buildings.  Defendant Heller is on the Board of Directors of Trammell Crow.

(xi)     **Hunt Is Financially Dependent upon the Current EDS Board**: Defendant Hunt indirectly owns a 50% economic interest is Woodbine Development I, Ltd.  Under the terms of an agreement between EDS and Woodbine dated July 6, 1994, EDS retained Woodbine to market and develop certain land owned by EDS surrounding its Plano, Texas headquarters. During 2000, EDS paid Woodbine over $1.5 million (excluding reimbursement for out-of-pocket expenses) for real estate development and brokerage services under this agreement.

(xii)     **Baker Is Financially Dependent upon the Current EDS Board**: Defendant Baker is a named partner of the Law Firm of Baker & Botts LLP.  Baker & Botts provided legal services to EDS throughout the Relevant Period.

82.     Pre-suit demand would also be a futile and useless act because a majority of the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

(a)     Each of the Director Defendants exhibited a sustained and systemic failure to fulfill their fiduciary duties which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness.

(b)    The Director Defendants had a responsibility and obligation to assure that all press releases and filings of SEC reports were accurate and that all financial controls and other oversight procedures were in place that would have detected and prevented the false and misleading statements put out by the Company to the public and described in this Complaint.

(c)    EDS has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein; yet the Director Defendants have not filed any lawsuits against themselves or the other individuals who were responsible for the wrongful conduct which caused the filing of securities class actions against EDS and of the formal SEC investigation nor have they attempted to recover from the responsible persons any part of the damages EDS suffered and will suffer thereby, even in the face of the filing of other derivative suits laying out such misconduct.

83.    If the defendants were to bring this derivative action against themselves, they would thereby further expose their own negligence and misconduct which underlies allegations against the Company contained in the class action complaints for violations of federal securities law.  Such admissions would impair the Company's and their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the defendants.

84.    Plaintiff has not made any demand on shareholders of EDS to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    EDS is a publicly traded company with approximately 500 million shares outstanding, with thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or telephone numbers of shareholders; and

(c)     Making demand on all shareholders would force plaintiff to incur huge

expenses, assuming all shareholders could be individually identified.

# EVENTS OF 1999-2003

**General Background**

85.     EDS provides IT services to large companies and governmental entities.  More than

75% of the Company's revenues are derived from its Information Solutions line of business, through

which EDS provides computer networking and management services under contracts that range in

duration up to ten years or more.

**The WorldCom Contract**

86.     On February 11, 1999, defendants caused EDS to announce a new partnership with

WorldCom whereby both companies would exchange services in a deal with a combined value of

over $12 billion to both companies.  Brown called the deal a "major step" in EDS's turnaround.

Defendants caused EDS to issue a joint press release with WorldCom entitled "EDS and MCI

WorldCom Align to Capitalize on Global Electronic Business, Communications and Data Services

Markets; Companies Agree to Significant Outsourcing Agreements; EDS Purchases MCI

Systemhouse for $1.65 Billion."  The press release stated in relevant part that:

> In one of the largest agreements of its kind, EDS and MCI WorldCom today
> announced a framework that positions the companies to seize opportunities in the
> converging global communications and computing markets.  Each company and its
> customers will be better positioned to capitalize on the rapid growth in electronic
> business and global communications services.
>
> There are four key elements of the agreement:
>
> --      In a 10-year agreement, MCI WorldCom will outsource major portions of its
> information technology services to EDS.  EDS will assume responsibility for
> significant applications development and maintenance services and virtually
> all of MCI WorldCom's infrastructure services.  When finalized, this will
> represent the largest IT outsourcing agreement in the telecommunications
> industry to date, with revenues to EDS expected to range from $5-$7 billion
> over the life of the contract.

-- EDS will outsource the bulk of its global network to MCI WorldCom, with MCI WorldCom handling end-to-end management of voice and data communications services on a preferred basis for EDS and its customers. This agreement is expected to approximate $6-$8.5 billion in revenues to MCI WorldCom over the next 10 years.

-- EDS will acquire MCI Systemhouse for $1.65 billion in cash. The acquisition of Systemhouse, an IT services provider that delivered $1.7 billion in revenue in 1998, will enhance EDS' applications consulting and systems integration capabilities and rank the company among the largest information technology services providers in Canada. EDS believes it will achieve substantial synergies by integrating Systemhouse into its existing infrastructure.

-- MCI WorldCom and EDS will capitalize on the fast-growing market for global communications and data services, including electronic business applications. The companies intend to develop networking solutions to business and government entities worldwide utilizing the global capabilities of both companies. The expanded services will complement MCI WorldCom's existing array of network services now offered to large corporate and government users.

"Aligning with MCI WorldCom and its global telecommunications capabilities will enhance EDS' ability to serve our customers as they move into the digital world of electronic business," said Dick Brown, EDS chairman and CEO. "This relationship assures that both EDS and those we serve are positioned to capitalize on the cresting wave of global data and voice network services.

"We are also enthusiastic about working with the people who will be joining EDS from MCI WorldCom and Systemhouse," Brown continued. "To us, today's announcement offers the best of all worlds -- new business, new capabilities, new customers, new markets and new highly skilled and talented employees."

More than 12,000 employees primarily located in the U.S. and Canada are expected to transition into employment with EDS from MCI WorldCom and from Systemhouse. Approximately 1,000 EDS network employees from offices around the world will be offered employment with MCI WorldCom.

"This agreement is a classic win-win," said John Sidgmore, MCI WorldCom vice chairman. "It allows both companies to grow their core businesses while creating synergies as each expands its global offerings. EDS offers MCI WorldCom proven IT and integration expertise, which will be key to our ability to maintain our technology leadership position as we continue to aggressively deploy facilities and expand globally."

The MCI WorldCom IT outsourcing agreement names EDS as the company's preferred supplier of IT services. EDS will have responsibility for business process

management for selected billing functions, defined applications development and maintenance, mainframe operations, desktop and help desk services and LAN support.

The network agreement provides for MCI WorldCom to outsource EDS' network and establishes MCI WorldCom as EDS' preferred supplier of communications and network integration services. MCI WorldCom will have responsibility for voice, data and video transport, and other network services for EDS and many of the company's network customers.

According to Brown, "network capabilities are increasingly important to companies that want to emerge as the business leaders of the 21st century. Our customers in all industries and in every geography are placing growing emphasis on advanced network capabilities and the development of electronic business applications. We intend to be there for them -- and our relationship with MCI WorldCom will play a major role in seeing that happen."

87.    As part of the pact, WorldCom would outsource a significant amount of its IT services to EDS, which assumed responsibility for WorldCom's business-process management activities for selected billing functions, applications development and maintenance, mainframe operations, desktop and help-desk services, and local area network support over the following decade in a deal purported by defendants to be worth between $5 billion and $7 billion to EDS. In return, EDS would outsource the lion's share of its global network to WorldCom, which would handle end-to-end management of EDS's voice, data and video communications services.

88.    In May 1999, Brown announced at a securities analyst conference in New York a major corporate reorganization, including the formation of EDS's newest growth engine, E-Business Solutions. According to Brown, the new unit would combine and create strengths in solutions consulting and business process management, two capabilities critical to success in the electronic business market. It would also create a bridge between EDS's high-value-added management consulting, provided by EDS subsidiary A.T. Kearney, and the Company's new core IT outsourcing business, Systemshouse. Defendant Steingraber, Chairman and CEO of A.T. Kearney, would play an important role in executing the turnaround.

- 55 -

89.     What defendants failed to adequately disclose between the February 1999 announcement of the WorldCom/EDS contract and the October 1999 contract signing was that the two companies were at significant odds as to the actual terms of the deal. Though the February 1999 announcement said the deal would be complete by June 1999, in September 1999 *The Wall Street Journal* quoted Brown as now saying he believed there was "a better than even chance [the deal will] be consummated" by the end of 1999. While Brown admitted in September 1999 that the deal was "very complicated to put in contract language," he did not disclose that WorldCom was forcing EDS to commit to unattainable "minimum purchase requirements" backed by draconian "take or pay" penalty provisions. In fact, it would not be until July 1, 2002, that defendants finally outlined the complexities of the arrangement they ultimately struck with WorldCom, disclosing that there were actually two components of EDS's annual revenue commitment to WorldCom: a cumulative take-or-pay revenue threshold that increased by $400 million per year, and a higher cumulative threshold that increased by $600 million per year, which included the first $400 million threshold. In the event EDS failed to meet the higher annual threshold, or "minimum commitment," EDS would be forced to pay WorldCom 20% of the difference between EDS's actual spending and the higher threshold. EDS was also obligated to pay 100% of any short-fall below the $400 million take-or-pay threshold.

90.     On October 22, 1999, WorldCom and EDS executed the GNOA, an eleven-year outsourcing agreement. Pursuant to the GNOA, WorldCom agreed to supply, and EDS agreed to purchase, various telecommunication services. The GNOA requires EDS to purchase a minimum amount of services from WorldCom during each year of the GNOA (the "Minimums"). EDS was to purchase these services for itself and also purchase them to meet its customers' telecom needs. EDS was required to make a shortfall payment each year it did not meet its Minimums obligation. The GNOA contained both a Cumulative Network Minimum and a Cumulative Network Take-or-Pay

Minimum. EDS had to make a shortfall payment to WorldCom if it failed to meet the Cumulative Network Minimum or the Cumulative Network Take-or-Pay Minimum, based on a formula set forth in the GNOA. The GNOA also established the rates that would be charged by WorldCom to EDS. During the first year of the GNOA, WorldCom was obligated to provide EDS with the pricing set forth in the GNOA. But for both existing and new business after the first year, the GNOA provided that pricing would be adjusted so that EDS would be charged the lower of the current pricing or certain specified price measures, known as the "Network CC Rate" or "Network Commercially Competitive Rate," the "Network MFN Rate" or "Network Most Favored Nation Rate." The GNOA contained detailed provisions concerning when and how the Network CC Rate and the Network MFN Rate would be calculated, and pricing adjusted. Pursuant to §6.3 of the GNOA, WorldCom paid EDS $100 million in cash on the GNOA's Service Commencement Date (the "Network Payment"). The GNOA provided that EDS would have to repay the Network Payment to WorldCom if EDS did not purchase a set amount of network services from WorldCom. Pursuant to the GNOA, if EDS's purchases at the end of Year 5 (2004) had fallen short of the Cumulative Network Minimum by an amount in excess of $300 million, EDS would be required to refund the $100 million Network Payment in 20% increments to be paid in 2005 through 2009.

91.     Also on October 22, 1999, MCI WorldCom Network Services, Inc. ("MWNS") and EDS executed the Global Information Technology Services Agreement ("GITSA"), whereby EDS agreed to provide, and MWNS agreed to purchase, various IT services. The GITSA also contains provisions that required MWNS to purchase a minimum amount of IT services from EDS and to make a shortfall payment if those Minimums were not met. As with the GNOA, the GITSA had both cumulative minimum and cumulative take-or-pay minimum provisions.

92.     In connection with the signing of the WorldCom/EDS IT contracts, on October 25, 1999, defendants caused EDS to issue a press release announcing that EDS and WorldCom had "finalized dual outsourcing agreements, worth $12.4 billion combined," and that the "two agreements implement key aspects of the strategic business relationship the companies announced last February. The length of both agreements is 10 years plus one start-up year." According to the press release, WorldCom would outsource portions of its IT operations to EDS and EDS would assume responsibility for IT system operations at more than a dozen WorldCom processing centers worldwide. Defendants stated the value of the agreement was $6.4 billion to EDS and that approximately 1,300 WorldCom employees would transfer to EDS. EDS would outsource select functions of its global network operations to WorldCom, including network operations, management and engineering. Defendants stated the value of that agreement was approximately $6 billion to Worldcom and that approximately 1,000 EDS employees ultimately would transfer to WorldCom. Defendants' press release, quoted defendant Brown, proclaiming: "***EDS and MCI WorldCom worked diligently and carefully to structure a relationship that is right both for our companies and for our respective clients,***" and "'*[t]his relationship sets a new standard for global collaboration, putting us on course to meet and exceed our strategic objectives.*'" Again, defendants did not adequately disclose the substantial commitment EDS had agreed to in negotiating the WorldCom Contract or that EDS's senior officers knew it could not meet those commitments.

93.     Between 2000 and Worldcom's bankruptcy in July 2002, the two companies fought acrimoniously about EDS's failure to meet its premium commitment requirements and tried repeatedly to mediate their differences. As detailed in the Bankruptcy Motion of WorldCom, Inc. to Approve Settlement and Compromise of Disputes with Electronic Data Systems Corporation and

EDS Information Systems, L.L.C., which finally resolved the dispute with WorldCom's bankruptcy

estate in December 2002:

> *The difficult nature of the day-to-day relationship between EDS and MCI*
> *WorldCom became evident from the beginning. During the first year of the GNOA*
> *(2000), it became clear that EDS would not meet its Minimums obligation for that*
> *year. This fact caused significant friction in the relationship between EDS and*
> *MCI WorldCom, as each company blamed the other for the failure to generate*
> *anticipated network revenues.*

94.     In fact, unbeknownst to EDS's investors, by the 2Q 01, WorldCom began to focus on

the ratable accrual of EDS's penalty payments, and by mid-June 2001, internal WorldCom forecasts

were showing that EDS would again (for the second year in a row) fall short of its annual take-or-

pay commitment. At the time, based on EDS's performance, WorldCom was internally forecasting

that it was likely EDS would miss the five-year minimum commitment, and would therefore be

required to refund the $100 million prepayment starting in 2005. By June 14, 2001, WorldCom was

so confident, based on EDS's performance thus far, that EDS would miss the five-year minimum

commitment that WorldCom decided to begin immediately recognizing revenue for the payments

EDS would be obligated to make starting in 2005 for falling short of its five-year commitment,

recognizing a "catch-up" payment valued at $30 million in the second quarter, and $5 million in each

subsequent quarter. *But EDS was not recognizing an expense for the prepayment penalties and*

*was not disclosing to its shareholders the extent of problems it was having meeting the minimum*

*commitment required by the WorldCom Contract.*

95.     In the end, EDS would pay WorldCom $187 million for its failure to meet its

minimum commitments, would have to waive claims against WorldCom for sums owed to EDS in

WorldCom's bankruptcy and would have to take a $118 write-down on the WorldCom Contract.

**EDS's Improper Revenue Recognition Practices in Connection with the Navy Contract**

96.    EDS employed the percentage-of-completion method of accounting for recognizing revenue under its large, long-term contracts, which provided the means for the Company's revenue growth during the Relevant Period. The percentage-of-completion method permits companies to recognize revenue from certain long-term contracts as work progresses, rather than wait until the customer is billed. For example, if a company has completed 50% of the work required under a long-term contract, but the contract provides for no billing until the contract is 100% complete, percentage-of-completion accounting might permit the company to record 50% of the revenues it expects to earn over the life of the contract, thereby offsetting the costs of performing the work already incurred. Under this method of accounting, "unbilled revenues" represent revenues the company has "earned," but for which it is not yet entitled to bill the customer under the terms of the applicable agreement. Conversely, under the completed contract method, a company recognizes revenue only when the contract is completed or substantially complete.

97.    EDS's recognition of unbilled revenues through its use of percentage-of-completion accounting was the primary driver of its reported revenue growth during 2000-2002. Between fiscal 2000 and fiscal 2002, EDS's unbilled revenues increased by nearly 300%, from $1.031 billion to $3.033 billion. This increase in unbilled revenues was primarily responsible for the Company's increase in revenue during the same period from approximately $19.2 billion to $21.5 billion, or a 12% increase. Thus, if not for its inclusion of unbilled revenues, EDS's total revenues would have remained stagnant during the Relevant Period. Approximately 60% of these unbilled revenues were derived from the Navy Contract. Nevertheless, defendants caused EDS to represent that its recognition of unbilled revenue through its use of the percentage-of-completion method of accounting complied with GAAP, as set forth in its annual report on Form 10-K for fiscal 2001:

For certain unit-price and fixed-price contracts, we follow the guidance contained in AICPA Statement of Position ("SOP") 81-1, Accounting for Performance of Construction-Type and Certain Production-Type Contracts. SOP 81.1 requires the use of percentage-of-completion accounting for long-term contracts that contain enforceable rights regarding services to be provided and received by the contracting parties, consideration to be exchanged, and the manner and terms of settlement, assuming reasonably dependable estimates of revenue and expenses can be made.... Amounts recognized in revenue are calculated using the percentage of services completed, on a current cumulative cost to total cost basis. Cumulative revenues recognized may be less or greater than cumulative costs and profits billed at any point in time during a contract's term. The resulting difference is recognized as unbilled or deferred revenue.

98.     Defendants also represented, as set forth in the Company's Form 10-K for fiscal 2001, that EDS continually evaluated its estimates, judgments and assumptions based on available information and experience. As reported in the *Asian Wall Street Journal* on September 27, 2002, according to Scot McDonald, EDS's chief accounting officer, EDS examined contracts every three months to make sure estimates were on track. If the contracts were off by more than $5 million, senior executives joined the review.

99.     Defendants' representations concerning the manner in which EDS recognized revenue under the percentage-of-completion method of accounting was materially false and misleading because defendants either knew or, but for their severe recklessness, should have known that due to significant deficiencies existing in the operational effectiveness of its controls to estimate revenue and costs, EDS lacked the ability to properly estimate its costs and revenues with respect to the Navy Contract. Furthermore, as delays associated with additional testing, the discovery of thousands of pre-existing software applications that were incompatible with the new intranet, and EDS's delivery of defective products affected EDS's progress on the Navy Contract causing increased costs, defendants knew or were severely reckless in disregarding that the Navy Contract was generating hundreds of millions of dollars in losses which should have been recorded and reported during 2000-2002.

100. The $6.9 billion Navy Contract, the largest government outsourcing contract in history, was awarded to EDS by the United States Navy on October 6, 2000. The contract provides for EDS to replace and link approximately 50,000 desktop computers, scattered over approximately 300 military bases worldwide, into a single, highly secure intranet network over a three- to five-year period. On its Web site, EDS listed the award of the Navy Contract as the fourth most significant event in the Company's history.

101. In reality, various severe problems infected the Navy Contract from its inception, which should have precluded EDS from recognizing revenue from the contract under the percentage-of-completion method of accounting. As reported by *Business Week*, EDS arrived at its $6.9 billion bid by estimating only a 4% profit margin for the Company – nearly 43% less than the 7% margin EDS included in most of its "mega-deal" contracts. Such a low margin created a virtual certainty that EDS would incur a loss on the contract from the outset, given the vastness of the undertaking and the likelihood of cost over-runs. Indeed, according to the same *Business Week* article, defendant Daley advised other EDS executives at the time the contract was awarded that EDS would likely never achieve a profit on the contract.

102. The likelihood of a loss due to the low profit margin included in the bid was exacerbated by the payment terms under the contract. Section 5.9.3.2 of the Navy Contract provided for the Navy to pay EDS the full contract price for work performed only "[a]t the time when [EDS] meets or exceeds the service level agreements for the ordered segment," as determined by the Navy through its testing criteria. Given the small profit margin included in the contract, any unforeseen problems creating delays would immediately generate a loss.

103. The severe problems encountered immediately upon implementation and the significant deficiencies in the Company's inability to estimate its costs precluded recognizing

- 62 -

revenue using the percentage-of-completion method.  For example, during the first quarter of fiscal

2001, defendants learned that EDS had severely underestimated the problem of transferring "legacy

software" – software applications that remained from the Navy's pre-existing computer system – to

the new intranet being created by EDS.  Specifically, the Navy Contract required EDS to eliminate

duplicative legacy software, and to transfer necessary programs to the new workstations.  Upon

commencing work at the Naval Air Systems Command in Patuxnet River, Md., in early 2001,

however, EDS executives discovered that a substantial number of the legacy programs slated to be

transferred were incompatible with the new Windows-based intranet.  By 2002, according to

*Business Week*, over 100,000 incompatible programs had been identified, which required thousands

of intranet users to utilize two workstations.

104.    Indeed, in September 2001, based upon these problems and the inability to satisfy

Navy testing, the Navy deferred approximately $628 million in orders under the Navy Contract until

further testing proved successful.  As a result of this decision by the Navy, EDS laid off 10% of its

workforce devoted to the Navy Contract in September 2001.  In an e-mail dated May 6, 2002, Naval

Air NMCI Transition Manager George Kalnasy acknowledged the persistence of the legacy software

issue, assuring Navy personnel that further EDS workstations would not be delivered until the

problem had been solved.  Mr. Kalnasy also detailed a series of other problems in his May 6 e-mail

disrupting transition to the new intranet, including the following: (i) failure to provide remote access

service for 61% of the users testing this function on behalf of the Navy in various facilities; (ii)

failure to provide acceptable secure web access; and (iii) failure to provide adequate "help desk"

support.

105.    Defendants knew of the problems pervading its progress on the Navy Contract.  In the

late Spring of 2002, the Institute for Defense Analysis ("IDA") completed its own independent

- 63 -

testing of the Navy project, which identified the inadequate rate of rationalization/certification of legacy applications to meet the Navy deployment schedule as a high risk associated with the project. IDA further found that the slow rate of certification that these software applications would not interfere with other applications and that they operated within accepted security policies did not support EDS's deployment schedule.

106.    The IDA also reported on the problems affecting the Enterprise Management System ("EMS"), the system enabling EDS to manage a large and complex network such as the Navy and to automatically capture and report service level agreement performance data to the government. The IDA reported that, during testing, the "delivery and integration of EMS was continually delayed, and as the network grew, many of the management functions remained manual or semi-automated." IDA recommended that the Navy increase its monitoring of the EMS. The IDA also recommended that "the performance data being gathered by EMS and reported by the contractor [EDS] to the government be independently verified throughout the life of the contract."

107.    The IDA report also stated that, while the seat roll-out process was critical to meeting the schedule for the system's deployment, the IDA found the process lacked proper management oversight and suffered numerous problems. Specifically, "ineffective coordination of customers for delivery of desktops caused high unavailability rates (25-50 percent), and lack of product assurance process caused significant rework. As a result, the seat roll-out rate remained well below the desired 100 seat-per-day-per site rate."

108.    Based on these problems, by June 2002, more than 18 months after the Navy had awarded the Navy Contract, EDS had failed to transition even 5% of the workstations called for under the contract to the new intranet due to severe functionality problems. Nevertheless, defendants failed to halt EDS's revenue recognition or recognize the losses it had incurred in

connection with the Navy Contract. To the contrary, in April 2002, defendants embarked upon a

plan to accelerate revenue recognition on the Navy Contract by speeding up the roll-out of additional

equipment, regardless of the Company's inability to meet the Navy's standards.

109.    On April 25, 2002, EDS Navy Program Director Mike Hatcher sent an e-mail to EDS

personnel in which he outlined a new "scorched earth policy" designed to deliver equipment to the

Navy regardless of its functionality, and even in the absence of a "definitized order" from the Navy:

> [W]e have agreed with [Rear Admiral] Munns and the Navy that ruthlessly rolling
> seats is the only way for NMCI to survive and prosper. Gen. Edmonds characterized
> this approach in a meeting with RADM Munns as scorched earth seat rollout, and I
> think that pretty much tells the story. Our present way of working would probably
> only result in about 60,000 seats rolled out in 2002, which if left unchanged would
> spell an end to the NMCI program by summertime. We've come too far to let that
> happen ....
>
> The bottom line is we're going to roll seats, and will be diverting many resources to
> this goal. Any obstacle that gets in the way will be crushed. No more IATO delays
> [i.e., certifications from the Navy that the new workstations comply with security
> standards promulgated by the Department of Defense and are approved to operate],
> application packaging delays, can't get the [applications], can't get the user-to-apps
> mapping, can't get the definitized order, etc. We will set the seat rollout schedule,
> and everything else will be slave to that. If [software applications] are not there, they
> will get a vanilla NMCI seat with nothing but the gold disk [i.e., the standard
> software installed on new intranet terminals]. If the order is not definitized, they will
> get a seat type of [EDS'] choosing.
>
> This is a good news story, and creates the breakout we've been waiting for on NMCI.
> Better times are just ahead!! Stout hearts.

110.    The severe problems associated with the implementation of the Navy Contract were

ultimately recognized by Congress, which put a halt to EDS's attempts to continue to deliver

unsatisfactory products until previously delivered equipment had been adequately tested, and pre-

existing problems had been corrected. On June 25, 2002, the House Committee on Appropriations

found severe defects in the implementation of the Navy Contract, and openly criticized EDS's

representations that the intranet system was "ready for widespread deployment," instead finding that

- 65 -

"excerpts from [the EDS] report are indicative of this questionable conclusion and clearly demonstrate the shortcomings of testing." The report further stated:

> Some business processes were not well defined for the testers, limiting the effectiveness of the scenario; other business was not fully represented in the test site population, rendering an end-to-end look impossible. Still other business processes required a combination of NMCI and legacy applications, making an end-to-end test wholly on the NMCI system problematic at best.

> While independent operational test and evaluation is now planned for June 2003, it will not occur until over 75 percent or approximately 310,000 of the 411,000 NMCI seats have been ordered and at which time an estimated 100,000 seats will have been fully transitioned to the network. If the history of this program is any indication, significant problems are likely to be discovered when the system is subjected to rigorous operational test and evaluation.

111.    Based on these observations, the Appropriations Committee recommended additional orders under the Navy Contract wait until testing confirmed that at least 20,000 workstations, or merely 5% of the number of workstations subject to the Navy Contract, were fully operational and met functionality standards under the contract:

> The Committee believes it would be most beneficial for the Navy and NMCI if additional seat orders were delayed as part of this contract extension pending independent operational test and evaluation. Therefore, the Committee has included a general provision that prohibits the Navy from ordering additional seats above the current 160,000 authorized ... and requires that operational test and evaluation be conducted once there has been a full transition of not less than 20,000 workstations to the Navy-Marine Corps Intranet and the network is robust enough so as to perform adequate testing. The Committee believes that the delay in seat orders that will result will also provide the Navy and [EDS] much needed time to address the legacy application problems which will arise from the order of the first 160,000 seats.

112.    Despite the costs overruns as a result of the defective products shipped and the increased delays due to additional and more stringent testing, defendants still failed to record a loss on the contract or acknowledge that its failure to meet acceptance criteria set forth in the Navy Contract precluded further revenue recognition under GAAP. Nor did defendants cause EDS to disclose that its internal controls suffered from significant deficiencies that prevented it from

producing reasonably dependable estimates of its revenue and costs under the Navy Contract, which

precluded the use of the percentage-of-completion method altogether.

# FALSE AND MISLEADING STATEMENTS
# TO EDS SHAREHOLDERS

113.   On September 9, 1999, the Individual Defendants caused the Company to issue a

news release that announced a restructuring of EDS's segment reporting divisions. The byline was

entitled "EDS Unveils Plans to Simplify Business Approach and Simulate Growth:"

> EDS announced today it will fundamentally alter the way it does business to meet the
> demands of the new digital economy by focusing on four global lines of business.
> Those lines of business, aimed at driving growth for EDS and improving
> performance for its clients, include: A.T. Kearney; E.solutions; Business Process
> Management; and Information Solutions.
>
> "We are making these changes to ignite our growth engines and to reclaim
> leadership in the industry we founded," said Chairmen and Chief Executive Officer
> Dick Brown.

114.   Under the new segment reporting lines, the Business Process Management and

Information Solutions segments appeared to consist of those businesses characterized by long-term

engagements with significant worldwide demand:

- Business Process Management (BPM): Clients in burgeoning $130-billion-plus market for Business Process Management, can look to EDS for expertise in enterprise customer management, claims processing, and settlement processing solutions. Previously part of E.solutions, BPM will become a separate business line to focus attention on the unique features that drive growth and success in that market.

*     *     *

- Information Solutions:  Already a top global player in this market, EDS offers clients expertise in managing centralized systems, distributed systems, communications, and applications development. The worldwide IT services market exceeds $110 billion annually.

**Third Quarter 1999**

115.    On October 28, 1999, defendants caused EDS to issue the following earnings release

for the 3Q 99, which was filed on Form 8-K.  Under the heading "Contract Signings," the following

statements were made:

Management Comments

"EDS is living up to its ambitious goals – and its potential – with sound
earnings and productivity growth.  Quarter by quarter, EDS is delivering consistently
improved results," said Dick Brown, chairman and chief executive officer of EDS.
"Our $5.1 billion contract signings in the third quarter are laying a clear path to
future revenue strength, particularly when coupled with the recent MCI WorldCom
agreement."

\*        \*        \*

Total contract signings for the third quarter were $ 5.1 billion.... For the first
three quarters of 1999, contract signings totaled $13.7 billion.

In the third quarter, EDS and Continental Airlines signed a global service
agreement expected to generate revenues of more than $1 billion over the life of the
contract.  The contract calls for EDS to provide a range of existing and expanded
services, including inter-airline electronic ticketing and check-in ....

In addition, EDS entered into a 10-year $ 800 million (U.S.) IT services
agreement with Telecom New Zealand (Telecom NZ), which is the largest IT
services contract ever signed in New Zealand....

Early this week, EDS and MCI WorldCom concluded a $12.4 billion dual
outsourcing deal, comprised of a $6.4 billion IT outsourcing agreement from MCI
WorldCom to EDS and a $6 billion global network operations outsourcing to MCI
WorldCom.

116.    On this glowing report, the market price of EDS common stock climbed from its

previous day's close of $52.75 to close at $54 on October 28, 1999.

117.    On or about November 12, 1999, the Individual Defendants caused the Company to

file on Form 10-Q EDS's quarterly report for the three months ended September 30, 1999.

Defendant Daley signed the November 12, 1999 Form 10-Q.  The 3Q 10-Q repeated the same

- 68 -

information as the 1Q and 2Q 10-Qs concerning the WorldCom Contract and acquisition of Systemhouse. The 3Q99 10-Q also made the following statements:

> Revenues. Total revenues for the quarter ended September 30, 1999, rose $362.1 million, or 8%, over the corresponding quarter in 1998 to $4.71 billion . . . Revenues from non-GM clients for the quarter ended September 30, 1999, rose $392.5 million, or 11.4%, to $3.85 billion from $3.45 billion for the same period in 1998. The increase in non-GM revenues was primarily attributable to revenues of $313.0 million from Systemhouse, and new contracts signed in 1999 and 1998.

**Fourth Quarter and Fiscal 1999**

118.    On or about February 8, 2000, the Individual Defendants caused the Company to file on Form 8-K, as an exhibit, the February 3, 2000 earnings release for the 4Q 99 and the year ended 1999. Under the caption "Chairman's Remarks," defendant Brown had the following to say:

> "We are extraordinarily pleased to report better than expected earnings, record contract signings and significant progress in the e-commerce market with the launch of EDS CoNext...."

> Contract signings were a record $24.9 billion in 1999, demonstrating expansion and balance across geographies and industries. Signings more than doubled last year's $11.8 billion.... In the fourth quarter, signings at $11.2 billion were more than four times greater than 1998's comparable amount.

> The record level of new contract signings during the quarter include a $6.4 billion contract – the largest outsourcing contract ever in the communications industry – with MCI WorldCom and $1.4 billion of total contract signings in Europe.

> In addition to the $24.9 billion in contract signings, EDS concluded negotiations to extend its contracts with GM North America to 2003.

> At the end of 1999, EDS' backlog exceeded the prior year's amount by over 20 percent.

119.    On the preceding news originally announced on February 3, 2000, the Company's stock price rose by $1.57 per share to $69.94 or 2.29%, from its previous trading day's close on February 2, 2000, of $68.37 per share. By February 4, 2000, the price of EDS common stock closed at $75 per share.

120.     On or about March 15, 2000, the Individual Defendants caused the Company to file

on Form 10-K its Annual Report for the year ended December 31, 1999. The 1999 Form 10-K was

signed by the Individual Defendants. The 1999 Form 10-K continued to tout EDS's revenue growth

and reported an even greater percentage of revenues generated from outsourcing and other long-term

contracts in the Information Solutions and Business Process Management segments. The 1999 Form

10-K repeated the following information contained in previous Company filings: "Our fees are

generally paid pursuant to contracts with our clients. These contracts may provide for both fixed and

variable fee arrangements. The terms of our client contracts generally range from less than one year

in the high-value consulting business to up to ten years in our IT outsourcing business." In addition,

the MD&A section of the 1999 Form 10-K repeated the same information contained in the February

3, 2000 earnings release that was attached to the February 8, 2000 Form 8-K:

> Total revenues increased 10% in 1999 to $18.5 billion, up from $16.9 billion
> in 1998, which represented an 11% increase over 1997 total revenues of $15.2
> billion.... Revenues from non-GM clients grew 13% in 1999 to $14.9 billion,
> compared with a 15% increase to $13.3 billion in 1998, up from $11.5 billion in
> 1997. Approximately one-half of the increase in revenues from non-GM clients in
> 1999 was attributable to Systemhouse, which was acquired in April 1999, while the
> other half of the increase resulted from new contract signings.
>
>      *   *   *
>
> Our gross margin percentage [(revenues less cost of revenues/revenues)] increased to
> 18% in 1999 compared with 17% in 1998, which decreased from 20% in 1997. As a
> result of our cost saving initiatives implemented during 1999, we realized an
> improvement in our gross margins in the latter half of the year. These improvements
> were partially offset by lower gross margins in the first half of the year.... In
> addition, billing rates for certain services provided to GM decreased in 1999 and
> 1998, and commensurate cost reductions were not realized. Although the declines in
> revenues related to these existing services were partially offset by new contracts with
> GM for additional products and services, the gross margins on these new contracts
> were lower than historical levels. The renegotiation of our sector agreements with
> GM covering its North American operations and GMAC, which became effective
> January 1, 2000, is expected to adversely impact future revenues and margins
> attributable to our contracts with GM. This negative impact on future margins is
> expected to be offset by cost savings resulting from initiatives implemented in 1999

that are designed to improve future operating margins associated with non-GM clients.

**First Quarter 2000**

121.   On April 27, 2000, the Individual Defendants caused the Company to issue an earnings release for the quarter ended March 31, 2000. The byline read "EDS First Quarter EPS Increases 31 Percent to $0.47 [and] IT Leader Signs $4.5 Billion in New Contracts, Up 50 percent from 1999." Defendant Brown stated in the April 27, 2000 press release that "'[o]ur operating margin increased 200 basis points to 8.3 percent from the prior year, demonstrating continued and sustained gains in productivity.'"

122.   On the preceding news, the Company's stock price rose by $0.31 per share to $72.50 or 0.4% from its previous day's close of $72.19 per share on April 26, 2000.

123.   On or about May 12, 2000, the Individual Defendants caused the Company to file with the SEC on Form 10-Q the report for quarter ended March 31, 2000. Defendant Daley signed the 1Q00 10-Q. The 1Q00 10-Q reported the following under the caption entitled "Results of Operations:"

> Revenues. Total revenues for the quarter ended March 31, 2000, [sic] rose $204.1 million, or 5%, over the corresponding quarter in 1999 to $4.5 billion. Revenues from non-GM clients for the quarter ended March 31, 2000, [sic] rose $239.8 million, or 7%, to $3.7 billion from $3.4 billion for the same period in 1999. The increase in non-GM revenues was primarily the result of new contracts signed in 1999, and from revenues associated with the acquisition of Systemhouse in April 1999.
>
> *     *     *
>
> Costs and expenses. The gross margin percentage [(revenues less cost of revenues)/revenues] increased to 17.5% for the three months ended March 31, 2000, compared with 16.6% for the corresponding period in 1999. This increase was due primarily to company-wide productivity and repositioning initiatives implemented in 1999, and was partially offset by a decline in the gross margin on our GM business resulting from the previously announced renegotiation of our sector agreements with GM ... which became effective January 1, 2000.

**Second Quarter 2000**

124.    On July 27, 2000, the Individual Defendants caused the Company to issue an earnings release for the quarter ended June 30, 2000. The byline to the earnings release read "IT Leader Signs Record $6.1 Billion in New Contracts, E.Solutions Revenue Growth Again Exceeds 35 Percent." The earnings release continued, "[d]uring the second quarter, EDS signed more than 1,100 contracts totaling $6.1 billion, a record for a sixth straight quarter. Signings were strong across EDS' four lines of business and across geographic regions." The earnings release specifically attributed the following, among other statements, to defendant Brown:

> "Our revenue grew seven percent on an organic basis this quarter[.] We are confident EDS' revenue performance will improve in the second half of the year and beyond.

> "EDS' fundamentals are strong. Our contract win rate, backlog of signed business and pipeline of new business opportunities are at record levels. Our sales force productivity is twice what it was a year ago[.] These are all positive indications for revenue growth going forward. Moreover, we continue to make solid progress toward our long-term financial goals, particularly in operating margin improvement, which has been favorably impacted by our cost reduction and productivity improvement plans implemented over the last 18 months.

125.    On the preceding news, the Company's stock price rose by $1.62 per share to close at $42.31 on July 28, 2000, or 3.98% from its previous close on July 26, 2000, of $40.69 per share.

126.    On or about August 11, 2000, the Individual Defendants caused the Company to file on Form 10-Q EDS's quarterly report for the quarter ended June 30, 2000. The 2Q00 10-Q was signed by defendant Daley. The following statements were made under the caption "Results of Operations:"

> Revenues. Total revenues of $4.6 billion for the quarter ended June 30, 2000, remained flat, when compared to the corresponding period in 1999, as a result of an increase in revenues from non-GM clients offset by a decrease in revenues from GM. Revenues from non-GM clients for the quarter ended June 30, 2000, rose $72.4 million, or 2%, to $3.8 billion from $3.7 billion for the same period in 1999. The increase in non-GM revenues was primarily the result of new contracts signed in 1999 and 2000, and from revenues associated with the acquisition of Systemhouse in

April 1999.... The decrease in revenues from GM is primarily attributable to the previously announced renegotiation of certain sector agreements ... that became effective January 1, 2000.

\*       \*       \*

Costs and expenses. Our gross margin percentage [(revenues less cost of revenues)/revenues] increased to 18.7% for the three months ended June 30, 2000, compared with 17.6% for the corresponding period in 1999.... The increase in gross margin for the three and six months ended June 30, 2000, was due primarily to company-wide productivity and repositioning initiatives implemented in 1999, and was partially offset by a decline in the gross margin on our GM business resulting from the renegotiation of certain sector agreements.

**Third Quarter 2000**

127.    On October 26, 2000, the Individual Defendants caused the Company to issue an earnings release for the quarter ended September 30, 2000. The byline read "EDS Third Quarter Earnings Per Share Up 16 Percent to 59 Cents; Digital Economy Leader Signs Record $6.2 Billion in Third Quarter Contracts." The October 26, 2000 press release attributed the following statements, among others, to defendant Brown:

"These historic wins and a seventh consecutive quarter of record new business signings show that EDS is building a foundation for sustainable, long-term profitable growth[.]

"In addition to record contract signings in the quarter, EDS continued to improve operational effectiveness and efficiency. Operating margin increased to 9.7 percent in the quarter from 8.7 percent a year ago.... EDS remains on course to achieve its goal of a 10 percent operating margin run rate by year-end.

128.    On the preceding news the Company's stock price rose by $3.93 per share or 8.75% to close at $48.81 on October 27, 2000, from its close on October 26, 2000 of $44.88 per share.

129.    On or about November 13, 2000, the Individual Defendants filed with the SEC on Form 10-Q the Company's report for the quarter ended September 30, 2000. The 3Q00 10-Q was signed by defendant Daley. The following statements were made under the caption "Results of Operations:"

- 73 -

Revenues. For the three months ended September 30, 2000, total revenues increased $35.0 million, or 1%, to $4.7 billion when compared to the corresponding period in 1999, as a result of an increase in revenues from non-GM clients partially offset by a decrease in revenues from GM. Revenues from non-GM clients for the quarter ended September 30, 2000, rose $68.1 million, or 2%, to $3.9 billion when compared to the corresponding period in 1999 primarily as a result of new contracts signed in 1999 and 2000.... The decrease in revenues from GM is primarily attributable to the previously announced renegotiation of certain sector agreements ... that became effective January 1, 2000.

*     *     *

Costs and expenses. Our gross margin percentage [(revenues less cost of revenues)/revenues] increased to 19.1% for the three months ended September 30, 2000, compared with 18.2% for the corresponding period in 1999.... The increase in gross margin for the three and nine months ended September 30, 2000, was primarily due to ongoing company-wide productivity and repositioning initiatives, and was partially offset by a decline in the gross margin on our GM business resulting from the renegotiation of certain sector agreements.

130.    Each of the statements identified above in ¶¶113-129 were false or misleading when made because defendants knew that EDS was falling behind significantly on its minimum commitment requirements on the WorldCom Contract, that its relationship with WorldCom was suffering, and that the Company would likely have to pay the prepayment penalty to WorldCom for missing its minimum commitment requirements. Nonetheless, defendants continued touting EDS's "turnaround" efforts and signing of new contracts despite the grave peril that the Company was in with regards to the WorldCom Contract.

**Fourth Quarter 2000**

131.    On February 7, 2001, defendants issued a press release reporting revenue of $5.2 billion and $19.2 billion for the 4Q and fiscal year 2000, compared to $4.92 billion and $18.73 billion for the comparable periods in 1999. EDS's revenues for 2000 included approximately $10 million from the Navy Contract. Defendants further reported earnings per share ("EPS") for the quarter of $.70, excluding one-time items, marking the seventh consecutive quarter of comparable year-over-year double-digit EPS growth. In listing its 4Q 00 milestones, defendants caused EDS to

- 74 -

report it was the "[h]ighest quarter for revenue" and earnings per share.  The Company reported net income for the year of $321.4 million.

132.    On March 16, 2001, defendants filed with the SEC EDS's consolidated Annual Report on the Form 10-K for the year ended December 31, 2000 ("2000 Form 10-K"), which confirmed the Company's financial results for 4Q and fiscal 2000 as initially reported.  Defendants further reported in the 2000 Form 10-K that "[t]otal revenues increased 3% in 2000 to $19.2 billion, up from $18.7 billion in 1999 ....  Base revenues [revenues from clients other than General Motors and its affiliates] grew 5% in 2000 to $15.9 billion ...."  Also, defendants assured EDS's shareholders in its 2000 Form 10-K that "[p]rovisions for estimated losses are made in the period in which the loss first becomes apparent."  Finally, the 2000 Form 10-K assured EDS's shareholders that its financial statements

> present fairly, in all material respects, the financial position of [EDS and subsidiaries for the preceding two years] and the results of their operations and their cash flows for each of the years in the three years [preceding] the period ended December 31 ... in conformity with accounting principles generally accepted in the United States of America.

The 2000 Form 10-K was signed by defendants Brown and Daley, and the rest of EDS's then directors.

133.    Each of the statements identified above were false or misleading when made because defendants knew that EDS had significant deficiencies in the operational effectiveness of its internal controls to estimate revenues and costs for the Navy Contract.  Specifically, in 1Q 03, EDS would admit that it had "significant" deficiencies which its auditors had determined to be a reportable condition with respect to EDS's operational effectiveness of its controls over the process for estimating revenues and costs for the Navy Contract.  The existence of these significant deficiencies meant that the Company should not have recognized revenue on the Navy Contract using the

- 75 -