percentage-of-completion method of accounting, but should have waited until work was completed on this contract to recognize revenue.

**First Quarter 2001**

134.     On April 25, 2001, defendants issued a release reporting 1Q 01 revenue of $5.0 billion, compared to $4.57 billion for the quarter ended March 31, 2000. The Company reported EPS of $.56, noting it marked the eighth consecutive quarter of double-digit EPS growth. Defendants also reported net income of $446.1 million. In the release Brown stated: "'EDS' momentum continues in 2001, buoyed by accelerating revenue growth .... Despite a challenging world economy, EDS' performance was strong in the quarter. This is supported by our record contract signings, double-digit base revenue and earnings growth, and improved margins.'"

135.     On or about May 15, 2001, defendants caused EDS to file with the SEC its Form 10-Q for the period ending March 31, 2001, which confirmed the false and misleading results in the Company's April 25, 2001 release. The 1Q 01 10-Q represented that these financial results were presented in accordance with GAAP and that "[i]n the opinion of management, all adjustments, which are of a normal recurring nature and necessary for a fair presentation, have been included."

136.     Each of the statements identified above were materially false and misleading when made because defendants knew or were severely reckless in disregarding that:

(a)     As EDS's independent auditors would later confirm, significant deficiencies existed in the operational effectiveness of the Company's internal controls over the process of estimating its revenues and costs with respect to the Navy Contract. Thus, defendants could not make reasonably dependable estimates which precluded EDS from recording revenue using the percentage-of-completion method of accounting for the Navy Contract; and

(b)     In using the percentage-of-completion method of accounting, defendants improperly recognized revenue from the Navy Contract in the 1Q 01 because they knew that EDS

- 76 -

was delivering defective products, which, along with the problems associated with the unsuccessful transfer of thousands of legacy software applications, were causing delays and costs overruns that caused EDS to incur substantial losses on the Navy Contract.

**Second Quarter 2001**

137.    On July 25, 2001, defendants issued a release reporting revenues of $5.09 billion compared to $4.65 billion for the comparable period in fiscal 2000. Defendants further reported that EPS increased 17% to $.62 from $.53 in the year ago quarter, marking the ninth consecutive quarter of double-digit EPS growth. Defendants further reported that net income rose 18% to $300 million, compared with $254 million a year ago.

138.    On August 8, 2001, defendants filed with the SEC the Company's Form 10-Q for the period ending June 30, 2001, which confirmed the results announced in the Company's July 25, 2001 release. The 2Q 01 10-Q further represented that these financial results were presented in accordance with GAAP and that "[i]n the opinion of management, all adjustments, which are of a normal recurring nature and necessary for a fair presentation, have been included."

139.    Each of the statements identified above were materially false and misleading when made because defendants knew that:

(a)    As EDS's independent auditors would later confirm, significant deficiencies existed in the operational effectiveness of the Company's internal controls over the process of estimating its revenues and costs with respect to the Navy Contract. Thus, defendants could not make reasonably dependable estimates which precluded EDS from recording revenue using the percentage-of-completion method of accounting for the Navy Contract; and

(b)    In using the percentage-of-completion method of accounting, defendants were improperly recognizing revenue from the Navy Contract in the 2Q 01 because EDS was delivering defective products, which, along with the problems associated with the unsuccessful transfer of

thousands of legacy software applications, were causing delays and costs overruns that caused EDS to incur substantial losses on the Navy Contract.

**Third Quarter 2001**

140.    On October 24, 2001, defendants issued a release reporting revenues of $5.6 billion, compared to $4.79 billion a year ago, and EPS of $.69, a 17% increase above the $.59 reported in the year ago quarter. In listing the Company's third quarter "milestones," defendants noted it was the tenth consecutive quarter of double-digit year-over-year EPS growth. Defendants further reported that "[w]ith a 21 percent revenue increase, Information Solutions, EDS' strategic infrastructure business, achieved its third consecutive quarter of 20 percent or better organic growth."

141.    On October 24, 2001, defendants held a conference call for EDS shareholders and investors to discuss the Company's 3Q 01 results. Brown and Daley reiterated EDS's financial results for the 3Q 01 as contained in the October 24, 2001 release. Daley stated that "[t]hird quarter revenue growth ... was also favorably impacted by the Navy Contract. *Progress on this contract is ahead of plan and current year contract revenues are greater than we had initially anticipated*."

142.    During the October 24, 2001 conference call, Brown stated: "We have booked $230 million in revenues from the Navy in the third quarter and in 2001, an incremental increase of about 2% has been the impact on our revenues, total EDS revenues."

143.    On November 13, 2001, defendants filed with the SEC the Company's Form 10-Q for the quarter ending September 30, 2001, which confirmed the financial results announced in the Company's October 24, 2001 release. For the quarter, the 3Q 01 10-Q also represented that revenues from the Information Solutions segment accounted for $4.2 billion. The 10-Q further represented that these financial results were presented in accordance with GAAP and that "[i]n the opinion of management, all adjustments, which are of a normal recurring nature and necessary for a

fair presentation, have been included." The EDS Board approved the statements contained in the 10-Q, and Daley signed it.

144.    Each of the statements identified above were materially false and misleading when made because:

(a)    As EDS's independent auditors would later confirm, significant deficiencies existed in the operational effectiveness of the Company's internal controls over the process of estimating its revenues and costs with respect to the Navy Contract. Thus, as described, defendants could not make reasonably dependable estimates which should have precluded EDS from recording revenue using the percentage-of-completion method of accounting for the Navy Contract; and

(b)    In using the percentage-of-completion method of accounting, defendants improperly recognized revenue from the Navy Contract in 3Q 01 because EDS was delivering defective products, which, along with the problems associated with the unsuccessful transfer of thousands of legacy software applications, were causing delays and costs overruns that caused EDS to incur substantial losses on the Navy Contract.

**Fourth Quarter and Year-End 2001**

145.    On February 7, 2002, defendants issued a release announcing that EDS had achieved "record" total revenue of $5.9 billion for 4Q 01 and $21.5 billion for 2001, compared to $5.2 billion and $19.2 billion for the 4Q 01 and fiscal year 2001. Defendants reported net income of $405 million and $1.36 billion for the 4Q 01 and fiscal year 2001, respectively. Defendants further reported EPS for the 4Q 01 of $.81 – a 16% increase over the comparable result of $.70 for the prior year. For 2001, defendants reported EPS, before one time items, of $2.68, a 17% increase from the comparable result of $2.29 in 2000. In listing "milestones" for the quarter, defendants noted it was the eleventh consecutive quarter of comparable year-over-year double-digit EPS growth. In the

press release, Brown stated: "'EDS has stayed the course of steady, consistent, profitable growth ....

Our unwavering commitment to service excellence produced record revenues.'"

146.    On February 7, 2002, defendants held a conference call for EDS shareholders and

investors to discuss its earnings for the 4Q 01 and fiscal year 2001.  Brown and Daley reiterated

EDS's revenue and earnings per share results.  Brown also stated that "EDS' financial foundation is

rock solid.  Our accounting is conservative, clear, concise."

147.    On March 6, 2002, defendants filed with the SEC EDS's Annual Report on

Form 10-K for the year ended December 31, 2001 ("2001 Form 10-K"), which confirmed EDS's

4Q 01 and fiscal year 2001 results that were initially reported in the Company's February 7, 2002

release.  The 2001 Form 10-K also reported that included in its revenues were unbilled revenues of

$1.84 billion and $1.03 billion at December 31, 2001 and December 31, 2000, respectively,

representing costs and related profits in excess of billings on certain unit-price and fixed-price

contracts.  Defendants further assured EDS shareholders in the 2001 Form 10-K that "[p]rovisions

for estimated losses are made in the period in which the loss first become apparent."  Defendants

also represented that its financial statements

> present fairly, in all material respects, the financial position of [EDS and subsidiaries
> for the preceding two years] and the results of their operations and their cash flows
> for each of the years in the three-year [preceding] period ended December 31 ... in
> conformity with accounting principles generally accepted in the United States of
> America.

Brown and Daley and the rest of EDS's then directors signed the 2001 Form 10-K.

148.    Each of the statements identified above were materially false and misleading when

made because defendants knew or were severely reckless in disregarding that:

(a)    As EDS's independent auditors would later confirm, significant deficiencies

existed in the operational effectiveness of the Company's internal controls over the process of

estimating its revenues and costs with respect to the Navy Contract.  Thus, defendants could not

make reasonably dependable estimates, which should have precluded EDS from recording revenue using the percentage-of-completion method of accounting for the Navy Contract; and

(b)     In using the percentage-of-completion method of accounting, defendants improperly recognized revenue from the Navy Contract in 4Q 01 because the Company was delivering defective products, which, along with the problems associated with the unsuccessful transfer of thousands of legacy software applications, were causing delays and costs overruns that caused EDS to incur substantial losses on the Navy Contract.

149.    On March 16, 2002 defendants fully disclosed EDS's minimum purchase requirements under the WorldCom Contract for the first time. The 10-K filed that day falsely stated that "We believe these obligations will be met through the normal course of business."

150.    On April 22, 2002, defendants issued a release reporting total revenue for the quarter was $5.34 billion, compared with $4.98 billion in 2001, and EPS of $.72, versus the comparable result of $.63 a year earlier. The release stressed EDS's increase in EPS, noting it marked the Company's twelfth consecutive quarter of double-digit EPS growth. Defendants also reported that net income was $354 million, up 18% from $301 million in the 2001 period.

151.    On May 6, 2002, defendants filed with the SEC EDS's Form 10-Q for the quarter ending March 31, 2002. The 10-Q contained the quarterly financial statements for EDS for 1Q 02, which confirmed the results announced in the Company's April 22, 2002 release. The 10-Q further represented that these financial results were presented in accordance with GAAP and that "[i]n the opinion of management, all adjustments, which are of a normal recurring nature and necessary for a fair presentation, have been included."

152.    Each of the statements identified above were materially false and misleading when made because defendants knew or were severely reckless in disregarding that:

- 81 -

(a)     As EDS's independent auditors would later confirm, significant deficiencies existed in the operational effectiveness of the Company's internal controls over the process of estimating its revenues and costs with respect to the Navy Contract. Thus, defendants could not make reasonably dependable estimates, which precluded the Company from recording revenue using the percentage-of-completion method of accounting for the Navy Contract; and

(b)     In using the percentage-of-completion method of accounting, defendants improperly recognized revenue on the Navy Contract in 1Q 02 because EDS was delivering defective products, which, along with the problems associated with the unsuccessful transfer of thousands of legacy software applications, were causing delays and costs overruns. Further, by September 2001, the Navy had deferred orders under the Navy Contract due to the various problems encountered in the implementation of the Navy Contract, which further delayed and increased costs associated with the contract. Moreover, in April 2002, to circumvent the problems slowing down EDS's implementation of the Navy Contract and its ability to recognize revenue, defendants caused EDS to embark on a "scorched earth policy" designed to deliver equipment to the Navy virtually regardless of its functionality, or even an order from the Navy, and to recognize revenue on these deliveries in violation of GAAP.

**Second Quarter 2002**

153.    On June 30, 2002 and July 1, 2002, the *New York Times* and *The Wall Street Journal*, respectively, published articles critical of EDS's accounting practices. The *New York Times* raised questions over the manner in which EDS was accounting for its cash flow. *The Wall Street Journal* questioned a number of the Company's accounting practices, including the manner in which EDS used the percentage-of-completion method of accounting to account for "unbilled revenue," and criticized EDS's use of zero profit on large deals in early stages, simply matching expenses with revenues. *The Wall Street Journal* article further noted that as of March 31, 2002, the Company's

unbilled revenue had doubled from the same period a year earlier to $2.18 billion, largely due to the

Navy Contract.

154.    On July 1, 2002, Keirstead of Lehman Brothers also raised questions concerning the

Company's accounting practices. Keirstead's report highlighted how dependent investors were on

the integrity of defendants to properly recognize revenue on EDS's long-term contracts, like the

Navy Contract:

> The second major Street issue relates to cash flow generation. Despite accelerating revenue growth and solid earnings, free cash flow was just $178 million in 2002 .... The bearish voices attribute this to poor profitability on recent contracts and/or aggressive accounting practices ....
>
> Needless to say, it is impossible to know the "real" profitability and cash flow characteristics of particular multi-billion dollar 10-year outsourcing arrangements. In fact, this inherent uncertainty ... is a material reason why EDS shares have under-performed in this new environment of accounting related suspicion. The balance sheet "facts" are not encouraging, but the EDS explanation seems reasonable. What to believe? ... Ultimately, however, it comes down to a question of trust. In our view, the current EDS management has performed relatively well since being assembled in early 1999; Dick Brown and his team turned around a troubled organization ... we believe in the integrity of the EDS management team and that the CFO and his reports are not playing accounting games to boost reported earnings.

155.    Defendants continued to defend EDS's accounting practices in the face of these

questions. On July 2, 2002, in the wake of WorldCom's revelation concerning its own improper

accounting, defendants held a call for EDS shareholders and investors to discuss EDS's relationship

with WorldCom and the Company's own financial policies and practices. According to Brown, the

purpose of the call was to put a *"stake in the ground"* and make clear that the Company's

accounting is *"clear, conservative and concise."* Further, despite the fact that Brown and the other

Board members knew of the significant deficiencies existing in EDS's controls with respect to the

Navy Contract, Brown stated that *"EDS is a company with strong financial controls and the*

*discipline to follow them."* In discussing the Company's use of the percentage-of-completion

accounting method, Daley represented that *"EDS' system around estimating costs is extremely sophisticated. And actually, I find it very robust from a risk assessment point of view."*

156.    During the call, Brown reiterated Daley's claim that EDS had strong internal controls: "As Jim pointed out, I can tell you that we have strong internal controls in place to make sure that margin adjustments [on profit of a contract] are only made when milestones are complete." At the end of the call, Brown emphasized that EDS "put a lot of controls and processes that absolutely minimize [EDS] risk."

157.    On July 24, 2002, defendants issued a release reporting that, for the 2Q 02, EDS's total revenue increased 8% to $5.5 billion versus $5.1 billion for the same quarter a year earlier. Defendants further reported EPS of $.64 and net income of $316 million. Excluding the impact of a provision for WorldCom's bankruptcy, EDS reported that 2Q 02 EPS and net income would have been $.78 per share and $383 million. In the release, Brown stated "'EDS' business and financial fundamentals are sound .... We continued to gain market share and increase revenue despite the continued weak corporate spending environment and the impact of WorldCom.'"

158.    On July 24, 2002, defendants held a conference call to discuss EDS's 2Q 02. Both Brown and Daley hosted the call and reaffirmed EDS's results as first reported in EDS's July 24, 2002 release. During the call, Daley stated that "EDS' accounting policies and procedures are conservative, consistent, clear and complete. We say this, too, with confidence and without hesitation." With respect to the increase in unbilled revenue, Daley stated that $300 million of the $392 million increase in unbilled revenue resulted from EDS's government business. In providing further detail, Daley also stated that "well over 50% of the total $2.6 billion of unbilled revenue balance is associated with government contracts and all of the increase in government contracting

activity is associated with the Navy Contract and the work we're doing for an agency in the U.K. government."

159.    On July 26, 2002, defendants filed with the SEC the Company's report on the Form 10-Q for the quarter ended June 30, 2002, which confirmed the results announced in the Company's July 24, 2002 release. The 10-Q further represented that these "financial results were presented in accordance with GAAP" and that "[i]n the opinion of management, all adjustments, which are of a normal recurring nature and necessary for a fair presentation, have been included." In conjunction with this filing, Daley and Brown each filed a sworn certification with the SEC, as required by SEC Order No. 4-460, attesting to the accuracy of EDS's reported financial results for fiscal 2001, and for the first two quarters of fiscal 2002. Defendant Daley signed the 10-Q.

160.    Each of the statements identified above were materially false and misleading because:

(a)    As EDS's independent auditors would later confirm, significant deficiencies existed in the operational effectiveness of the Company's internal controls over the process of estimating its revenues and costs with respect to the Navy Contract. Thus, as defendants could not make reasonably dependable estimates, which precluded EDS from recording revenue using the percentage-of-completion method of accounting for the Navy Contract; and

(b)    In using the percentage-of-completion method of accounting, defendants improperly recognized revenue from the Navy Contract in the 2Q 02 because EDS was delivering defective products, which, along with the problems associated with the unsuccessful transfer of thousands of legacy software applications, were causing delays and costs overruns. Further, by September 2001, the Navy had deferred orders due to various problems encountered in the implementation of the Navy Contract, which further delayed and increased costs associated with the contract.    Moreover, in April 2002, to circumvent the problems slowing down EDS's

implementation of the Navy Contract and its ability to recognize revenue, defendants caused EDS to

embark on a "scorched earth policy" designed to deliver equipment to the Navy virtually regardless

of its functionality, or even an order from the Navy, and to recognize revenue on the deliveries, in

violation of GAAP.

## DISCLOSURE OF THE MISMANAGEMENT
## AND FRAUDULENT CONDUCT AT EDS

161.    On September 18, 2002, approximately one month after defendants assured analysts

that the Company would meet prevailing revenue and earnings expectations, defendants issued a

press release warning that EDS's revenue and earnings for 3Q 02 would be much lower than

previous Company guidance. According to its September 18, 2002 press release, EDS reported that

it expected total revenue of $5.3-$5.5 billion, down 2%-5% from the $5.6 billion reported the year

before, and well below the 4%-6% increase previously projected by the Company. Defendants also

reported that EDS expected to report EPS of $.12-$.15 cents for the quarter as opposed to the $.74

per share it had estimated one month earlier – approximately $.62-$.64 below consensus estimates.

While defendants failed to provide much detail in the press release concealing this huge miss, they

did attribute part of the lower estimate to the "financial performance of certain contracts primarily in

Europe."

162.    Although defendants did not specifically identify the Navy Contract as a contributor

to its shortfall, investment analysts questioned EDS's use of the percentage-of-completion method to

recognize revenue on long term contracts, speculating that management had not told the full story.

For example, on September 19, 2002, Bear Stearns stated:

> We feel that there is a lot more to EDS' revised guidance than the factors cited by
> management. To the extent that EDS mispriced contracts over the past several years
> and then accounted for them under POC, we may be in for a prolonged period of
> depressed earnings at EDS.

163.   On September 24, 2002, in response to an investment community downgrade, defendants issued a press release to reassure the investment community that the Company's financial position remained strong.  Defendants also emphasized that lower third quarter guidance "*reflects provisions for all known contract issues*."

164.   In the weeks that followed, defendants gradually revealed additional shortfalls associated with the Company's long-term contracts, for which they had recognized revenue under the percentage-of-completion method of accounting.  On February 6, 2003, in a conference call with investment analysts, defendant Brown admitted that EDS had identified additional contracts in the fourth quarter where the Company had recognized revenue using percentage-of-completion accounting that had contributed to declining revenues and earnings.  When further questioned about the rising level of additional "problem" contracts, Brown claimed that it had to do with "the way we have cost at work and the way we're implementing against that cost profile a few number of contracts, in some cases they were contracts that had some terms and conditions that needed to be tightened down."  Nonetheless, Brown provided assurance that "*it's not our financial accounting systems or our accounting systems*."

165.   On December 23, 2002, EDS agreed to pay WorldCom $187 million and to drop certain claims EDS had against WorldCom in its bankruptcy to settle EDS's nonperformance of the WorldCom Contract, a dispute WorldCom's bankruptcy papers said had erupted in the beginning.

166.   On March 20, 2003, EDS announced that defendant Brown's employment with the Company had been terminated.  Thereafter, on May 7, 2003, EDS's new management announced that the Company would report a net loss of $126 million or $0.26 per share, compared with EPS of $.72 a year ago, which included a $334 million cumulative loss on the Navy Contract.  In the press release, EDS's new CEO, defendant Jordan, stated: "'*The new management team took extra time*

- 87 -

*this quarter to thoroughly review our business financials. The review led to today's action on the*
*NMCI Contract ....*"'

167.     EDS's new management also acknowledged the existence of significant deficiencies
in the operational effectiveness in its controls over the process of estimating revenues and costs
under the Navy Contract. On May 7, 2003, defendants held EDS's 1Q 03 earnings conference call
with EDS shareholders and investors, during which the new CFO disclosed that as part of EDS's
review of the Navy account, the Company and its outside auditors reviewed the internal controls for
this account and identified certain "significant deficiencies" in their operations. Jordan further
admitted during the call that, in addition to the Navy Contract, other "problem" contracts cost EDS
an additional $.09 in EPS in the quarter.

168.     Finally, on or about May 15, 2003, defendants filed with the SEC the Company's
quarterly report on Form 10-Q for the quarter ended March 31, 2003, which provided the most
complete disclosure on the Company's losses relating to the Navy Contract to date. Specifically, the
Company reported that the $334 million loss "resulted from a decline in the average seat price based
on the types of seats ordered and expected to be ordered by the DON [Department of the Navy], *as*
*well as a reduced period of time in which to generate seat revenue due to deployment delays and*
*associated incremental estimated operating costs.*"

169.     The Q1 03 10-Q also expanded on the "significant deficiencies" referenced in the
Company's 1Q 03 earnings conference call in which management disclosed that, upon undertaking
its own review of the Navy Contract, it discovered deficiencies in the operational effectiveness of
EDS's controls over estimating revenues and costs with respect to that contract. Upon review, its
auditors determined the deficiencies were "significant" and constituted a reportable condition:

> [M]anagement sought to determine, among other things, whether there are any
> "significant deficiencies" or "material weaknesses" in the design or operation of

internal controls. In professional auditing literature, "significant deficiencies" are referred to as "reportable conditions," which are control issues that could have a significant adverse effect on the ability to record, process, summarize and report financial data in financial statements. Auditing literature defines "material weakness" as a particularly serious reportable condition where the internal control does not reduce to a relatively low level the risk that misstatements caused by error or fraud may occur in amounts that would be material in relation to the financial statements and the risk that such misstatements would not be detected within a timely period by employees in the normal course of performing their assigned functions.

As a result of a review of the NMCI Contract completed after the first quarter of 2003, management and the Audit Committee of our Board of Directors discovered deficiencies in the operational effectiveness of controls over the process for estimating revenues and costs for the remaining term of the NMCI Contract. Our independent auditors reviewed these matters and advised the Audit Committee that, due to the size of the NMCI Contract they collectively constitute a significant deficiency that rises to the level of a reportable condition.

170.    An admission of inadequate contracts was made by Swan in the 1Q 03 conference

call held on May 7, 2003, in which he made the following disclosure:

*Lastly, as part of our overall review of the NMCI account, we and our external auditors reviewed the internal controls for this account and identified certain significant deficiencies in their operation....* [W]e are actively taking steps to improve the operation of the controls for this account, including improvements to the cost estimation process, the assignment of a different financial personnel, and the establishment of a newly staffed program management office.

171.    In EDS's SEC filing for 1Q 03, filed on May 15, 2003, defendants made the

following disclosure in the section on 'Controls and Procedures':

Within 90 days prior to the date of this report, EDS carried out an evaluation of the effectiveness of the design and operation of its disclosure controls and procedures. This evaluation was performed under the supervision and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer.

*             *             *

Based upon their evaluation, our management, including the Chief Executive Officer and Chief Financial Officer, concluded that, except as noted below, our disclosure controls and procedures are effective to ensure that material information relating to EDS and its consolidated subsidiaries is gathered on a timely basis to be included in our periodic reports.

In connection with its evaluation, management sought to determine, among other things, whether there are any "significant deficiencies" or "material weaknesses" in the design or operation of internal controls. In professional auditing literature, "significant deficiencies" are referred to as "reportable conditions," which are control issues that could have a significant adverse effect on the ability to record, process, summarize and report financial data in financial statements. Auditing literature defines "material weakness" as a particularly serious reportable condition where the internal control does not reduce to a relatively low level the risk that misstatements caused by error or fraud may occur in amounts that would be material in relation to the financial statements and the risk that such misstatements would not be detected within a timely period by employees in the normal course of performing their assigned functions.

As a result of a review of the NMCI Contract completed after the first quarter of 2003, management and the Audit Committee of our Board of Directors discovered deficiencies in the operational effectiveness of controls over the process for estimating revenues and costs for the remaining term of the NMCI Contract. Our independent auditors reviewed these matters and advised the Audit Committee that, due to the size of the NMCI Contract, they collectively constitute a significant deficiency that rises to the level of a reportable condition. Our independent auditors have advised management and the Audit Committee that this reportable condition does not constitute a material weakness. Management has implemented and continues to implement measures to correct and improve the effectiveness of the internal controls for this contract, including the following: increased frequency and scope of operational and financial reviews with senior account and corporate personnel; a newly-staffed program management office; stricter adherence to the process for approval of change orders; reorganization of account support functions and the appointment of a senior service delivery executive; assignment of additional finance and legal staff to the account; improvements in monitoring and reporting seat deployment; and improved communication with senior client representatives.

172.    In EDS's SEC filing for 1Q 04, filed on May 10, 2004, the Company made the

following disclosure in the MD&A Section on "Factors that may affect future results":

Breakdown in our internal controls and procedures could have a material adverse effect on us. Breakdowns in our internal controls and procedures could have a material adverse effect on us. During the third quarter of 2003, we adopted EITF 00-21 on a cumulative basis as of January 1, 2003. Prior to the adoption of EITF 00-21, the NMCI contract was accounted for on a percentage-of-completion basis. Following the first quarter of 2003, we reported the existence of deficiencies in the operational effectiveness of controls over the process for estimating revenues and costs over the remaining term of the NMCI contract. Our independent auditors had reviewed such deficiencies and advised our audit committee that, due to the size of the NMCI contract, they collectively constitute a significant deficiency that rises to the level of a reportable condition. This deficiency was subsequently remediated by management in 2003. We recently identified another example of deficiencies in the

operational effectiveness of those controls. In April 2004, our management learned of errors in the contract's percentage-of-completion accounting models with respect to the last two quarters of 2002. These errors had not previously been reported to management. As a result, management further reviewed and reformed the model to correct errors and to evaluate the effect of the revised model on our results of operations for the last two quarters of 2002. Management has concluded that our reported results for those periods are not affected because the revised models for such periods continued to show an excess of estimated revenues over costs, and the contract was then being accounted for on a zero-profit basis. This conclusion has been reviewed by our audit committee and independent auditors. In addition, in April 2004 management became aware that our purchasing process on the contract does not enable efficient vendor management and payable processing. This inefficient process resulted in the usage of capital of approximately $50 million in excess of previously expected amounts in the first quarter.

In the same filing for 1Q 04, filed on May 10, 2004, it stated in pertinent part in the section on

"Controls and Procedures:"

As a result of a review of the NMCI contract completed after the first quarter of 2003, management and the Audit Committee of our Board of Directors discovered deficiencies in the operational effectiveness of controls over the process for estimating revenues and costs for the remaining term of the NMCI contract that, collectively, constituted a significant deficiency that rose to the level of a reportable condition. We refer you to the discussion of the NMCI contract in "Managements' Discussion and Analysis of Results of Operations and Financial Condition" above for a discussion of such a deficiency identified by management in April 2004 relating to the accounting models for this contract for the third and fourth quarters of 2002. Management implemented measures to correct and improve the effectiveness of the internal controls for this contract during 2003, including the following: increased frequency and scope of operational and financial reviews with senior account and corporate personnel; a newly-staffed program management office; stricter adherence to the process for approval of change orders; reorganization of account support functions and the appointment of a senior service delivery executive; assignment of additional finance and legal staff to the account; improvements in monitoring and reporting seat deployment; and improved communication with senior client representatives. In April 2004, management identified a significant deficiency in the NMCI contract's purchasing and accrual process associated with certain hardware and subcontractor work-in-progress during 2003. This deficiency resulted in the untimely recognition of the purchase of certain hardware and assets under construction and is also considered to be a reportable condition due to the size of the NMCI contract. Management has implemented or is in the process of implementing measures to improve controls over this process, including centralized approval of all contract-related purchases, implementation of an automated warehouse management system, monthly subcontractor reporting of work-in-progress activities and increased operational monitoring and reporting of subcontractor activities.

173.   During 2003-2004, the full extent of the catastrophic failure of the attempted turnaround of EDS became evident. ***Unable to renegotiate the Navy Contract, defendants admitted to EDS's having suffered a loss of $1.6 billion on the contract – a loss that continues to grow even now***! As the Company's impaired financial condition continued to come out, its ability to sign new IT management contracts imploded – as large companies like Proctor & Gamble, McDonald's, Dow Chemical and Sears refused to contract with EDS.  Certain other contracts were terminated with EDS paying financial penalties.  EDS's problems went well beyond the Navy Contract fiasco.  EDS suffered a significant loss on the Baylor Health Care System contract which it could not perform and a $100 million loss on a contract with Dow Chemical.  EDS also lost a $6-$7 billion multi-year contract to run the United Kingdom's Inland Tax IT system when it came out that EDS's blundering performance had created a fiasco over the English child tax credit, widespread late payment of tax credits and refunds and the likely overpayment of some $3-$4 billion in refunds.  ***EDS ultimately reported a gigantic 2003 loss of $1.7 billion, all but wiping out its previously reported 2001-2002 profits – profits upon which EDS executives' multi-million-dollar bonuses had been based – and restated its previously reported financial results to eliminate $2.4 billion in previously reported profits***!  As a result of this financial implosion, EDS's free cash flow plummeted, forcing it to borrow over $1.1 billion – raising its total debt burden to over $4.4 billion.  At the same time, Moody's was slashing EDS's credit rating – ***finally to junk bond status*** "with negative implications" – which costs EDS millions of dollars of increased borrowing costs each year and also required it to make hundreds of millions of dollars of accelerated payments to certain customers based on contract provisions.

174.   The February 11, 2004, *Dallas Morning News* reported that Jordan had stated the following:

*The company he joined last year was disorganized* ... Mr. Jordan said.

As a former executive of Frito-Lay, a long-time EDS client, Mr. Jordan expected the computer services giant to be more disciplined and efficient.

*"Shocked would be the word, because I remember the old days," Mr. Jordan said. "This wasn't the EDS I knew."*

175.    In EDS's July 28, 2004 release announcing its poor 2Q 04 results, Jordan stated:

"EDS remains a tale of two cities," said Chairman and CEO Mike Jordan.... "[W]e continue to be burdened by the cleanup of past problem contracts, as exhibited by our lower cash flow guidance on Navy and the charge this quarter to terminate the company's 'other commercial contract.'"

176.    The February 6, 2004, *Dallas Morning News* reported that Swan and Jordan admitted:

Last spring, EDS identified about 12 "problem contracts," including the Navy deal, that were failing to meet expectations.

*   *   *

Because of low contract signings last year, EDS predicted that its sales will fall to between $21 billion and $22 billion this year compared to $21.5 billion in 2003. The company forecasted 2004 earnings of 50 cents to 60 cents per share.

Mr. Jordan said he and other executives have reorganized the company ....

"We've changed almost everything about our sales process in the last six to nine months," he said. "Now we've got an organization that's really aligned on a new way of doing business."

177.    The August 3, 2004, *Dallas Morning News* reported:

*Fixing EDS feels like dragging a ball and chain through a 100-yard dash, [Jordan] said. The ball and chain represented two things – the company's money-losing, operationally nightmarish contract with the U.S. Navy and the scathing criticism from credit-rating agencies.*

Those problems alone are enough to turn a sprint into a limp. But imagine you're Mr. Jordan, also having to finish the race with:

*Your hands tied behind your back. When Mr. Jordan joined EDS in March 2003, Moody's Investors Service had already downgraded the company's long-term debt twice in three months, making it tougher to obtain the fresh capital often required to start work on big contracts.

*With that handicap, Mr. Jordan hasn't been able to compete for contracts on a level playing field. And Moody's and other credit agencies have cited EDS' competitive disadvantage as a major factor in credit downgrades after Mr. Jordan took over as CEO.*

\*       \*       \*

Even if investors are willing to overlook the Navy deal as a lost cause, EDS still has to repair its reputation by meeting some of its goals on the contract instead of consistently pushing them back, analysts say.

"The headlines related to the Navy Contract start to reflect on other parts of the business," said Rod Bourgeois, an analyst with Sanford Bernstein. "That hurts morale and helps competitors, when they're facing EDS at the bidding table, have ammunition against EDS. A lot of these Navy problems have collateral damage."\

178.    Jordan told *Forbes* magazine in October 2004 that, although EDS invented the business of outsourcing, overhauling other firms' computer systems and running them far more efficiently, its own internal network was a haphazard and disjointed mess when he arrived. "'My PC remote access – I've never seen anything that bad.'" According to the October 2004 *Forbes* article, it was indicative of the state of the entire $20 billion Company – chaotic and diffuse. Jordan also told *Forbes*, "'[i]t was a holding company. It was 2,000 separate companies with a financial overlay to it.*' Big accounts were called on by up to 22 different EDS departments. The firm was losing big deals to competitors because it couldn't price them right and was entering into contracts that could not possibly turn a profit. '*To say I was shocked would be a mild understatement...,*'" Jordan told *Forbes*. "'*I knew this company, and I knew the founders. This was the Marine Corps .... But when I came here it was the Girl Scouts.*'"

179.    In January 2003 Daley was pushed out as CFO, in March 2003 Brown was pushed out as CEO, and in May 2003 Frederick was pushed out as executive vice president. However, *none of them were fired for cause, despite the grotesque misperformance of their jobs*. This allowed them to retain huge amounts of prior payments and bonuses and to pocket retirement and/or severance benefits worth millions. Brown alone – the main architect of this disaster – got

$31 million. EDS's Board did this to buy their silence and cooperation in not exposing the EDS Board's complicity in this disaster – in effect, paying "hush" money to hew to the EDS party line and not "tattle" on the directors. While Brown, Daley, Heller and Frederick were put out of the Company as sacrificial lambs during early 2003, EDS's directors orchestrated their departures to assure that they would be cooperative. Normally, when a corporation encounters this type of disaster, which includes accounting irregularities and SEC investigations, the Board arranges an independent investigation of the events to determine what went wrong and who did/knew what. EDS's Board did not do this. The few EDS executives who have been put out as scapegoats by the Board over the past few years have left with millions. As a result of their continuing concealments and cover-up, several – a majority – of the directors of EDS have held onto their positions of power, prestige and profit at the Company.

180. EDS's Board knew or recklessly disregarded that the Company's unusual bonus compensation plans created strong incentive and the opportunity for EDS's top executives to manipulate and falsify EDS's financial results to create profits to trigger huge bonus payments and stock benefits to themselves. Yet the EDS Board took no action to safeguard against such abuse or to even test or evaluate EDS's existing internal accounting and financial controls to determine if they were sufficient to prevent such abuse.

181. The result of EDS's 1999-2003 fiasco has been one of the most shocking exposures of fraud, deception, mismanagement, unjust enrichment and failed directorial oversight in history. Defrauded investors and employees have sued EDS in massive class action suits in the U.S. that will cost many millions of dollars to defend and expose EDS to billions of dollars of liability. In addition, EDS is subject to governmental and regulatory investigations, including investigations by the SEC and the DOJ, which will cost millions of dollars to defend and will ultimately result in large

fines and/or penalties. The credit rating agency Moody's has downgraded EDS's credit rating to

junk status. Also because of the damage to EDS's reputation and goodwill, its stock trades at a

substantial discount to the stocks of its peer group competitor companies and is likely to suffer from

what is known as the "*liar's discount*" going forward.

## GAAP VIOLATIONS

182.    SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) provides that financial statements

filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading

and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial

statements must also comply with GAAP, with the exception that interim financial statements need

not include disclosure which would be duplicative of disclosures accompanying annual financial

statements. 17 C.F.R. §210.10-01(a). The responsibility for preparing financial statements that

conform to GAAP rests with corporate management as set forth in §110.3 of the AICPA:

> The financial statements are management's responsibility.... Management is
> responsible for adopting sound accounting policies and for establishing and
> maintaining internal control that will, among other things, initiate, record, process,
> and report transactions (as well as events and conditions) consistent with
> management's assertions embodied in the financial statements. The entity's
> transactions and the related assets, liabilities, and equity are within the direct
> knowledge and control of management.... Thus, the fair presentation of financial
> statements in conformity with [GAAP] is an implicit and integral part of
> management's responsibility.

183.    Pursuant to these requirements, EDS's Annual Reports on Form 10-K for fiscal 2000,

filed with the SEC during the Relevant Period, assured investors that the Company's financial

statements

> present fairly, in all material respects, the financial position of [EDS and subsidiaries
> for the preceding two years] ... and the results of their operations and their cash flows
> for each of the three [preceding] years in the ... period ended December 31 ... in
> conformity with generally accepted accounting principles.

- 96 -

184.    Defendants also represented in EDS's reports on Form 10-Q for each of the quarters filed with the SEC during the Relevant Period, that the Company's financial results were presented appropriately, in accordance with GAAP:

> The accompanying unaudited condensed consolidated financial statements of [EDS] have been prepared in accordance with [GAAP] for interim financial information.  In the opinion of management, all adjustments, which are of a normal recurring nature and necessary for a fair presentation, have been included.

185.    Defendants Brown and Daley further represented in sworn certifications filed with the SEC, such as the one dated November 13, 2002, that neither EDS's Annual Report on Form 10-K for fiscal 2001 nor EDS's quarterly reports on Form 10-Q "contain[ed] any untrue statement of a material fact or omit[ted] to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by" such report, either by improperly recognizing revenue on the Navy Contract by using the percentage-of-completion method of accounting or by providing misleading positive statements concerning the status of the WorldCom Contract.

186.    Accounting Research Bulletin No. 45 ("ARB No. 45"), *Long-Term Construction-Type Contracts*, issued by the AICPA Committee on Accounting Procedure in 1955, describes the two generally accepted methods of accounting for long-term contracts for financial reporting purposes:

- The percentage-of-completion method recognizes income as work on a contract progresses; recognition of revenues and profits generally is related to costs incurred in providing the services required under the contract.

- The completed-contract method recognizes income only when the contract is completed, or substantially so, and all costs and related revenues are reported as deferred items in the balance sheet until that time.

187.    ARB No. 45, ¶15, describes the circumstances in which each method is preferable as follows:

The committee believes that, in general, when estimates of costs to complete and extent of progress toward completion of long-term contracts are reasonably dependable, the percentage-of-completion method is preferable. When lack of dependable estimates or inherent hazards cause forecasts to be doubtful, the completed contract method is preferable.

188. AICPA Statement of Position 81-1 ("SOP 81-1"), entitled *Accounting for Performance of Construction-Type and Certain Production-Type Contracts*, precludes recognizing revenue under the percentage-of-completion method unless the contractor has the "'ability to make reasonably dependable estimates' ... of the extent of progress toward completion, contract revenues, and contract costs." SOP 81-1, ¶23. SOP 81-1 continues by stating: "An entity using the percentage-of-completion method as its basic accounting policy should use the completed-contract method for a single contract or group of contracts for which reasonably dependable estimates cannot be made or for which inherent hazards make estimates doubtful." SOP 81-1, ¶25.

189. Defendants knew that the Navy Contract suffered from severe problems that should have precluded revenue recognition under SOP 81-1, including the following: (i) an inability to transfer necessary software applications to new workstations, thereby requiring intranet users to use two computers rather than one to perform their jobs; and (ii) a failure to provide key secure Web site access for intranet users, thereby further undermining and delaying the transition to the Navy intranet. Defendants also knew, or but for their severe recklessness should have known, that these problems had precluded EDS from demonstrating the successful installation of even 5% of the new intranet.

190. Defendants also knew, or but for their severe recklessness should have known, that EDS lacked the ability to produce reasonably dependable estimates that would allow revenue recognition under the percentage-of-completion method of accounting. As set forth in SOP 81-1, "the ability to produce reasonably dependable estimates is an essential element of the contracting business ... an entity without the ability to update and revise estimates continually with a degree of

confidence could not meet that essential requirement of GAAP." SOP 81-1, ¶26. SOP 81-1 further

provides that "[p]revious reliability of a contractor's estimating process is usually an indication of

continuing reliability, particularity if present circumstances are similar to those that prevailed in the

past."

191.    Defendants knew well that EDS's estimating process was unreliable based on past

experiences with other contracts for which EDS recognized revenue under the percentage-of-

completion method of accounting. For example, the Company reported a $200 million adjustment to

revenue for the 4Q 98, as discussed in a February 5, 1999 Bear Stearns analyst report:

> EDS said the $200 million adjustment to revenue is primarily related to a legal
> dispute with Xerox (a small portion of the $200 million is actually related to another
> profit challenged contract). EDS filed suit against Xerox in New York State Court
> over Xerox's obligation to pay for certain infrastructure services (Xerox is one of
> EDS' biggest customers). While EDS did not offer a clear explanation on the
> revenue adjustment, we believe that it relates to previously recognized revenue that is
> now in dispute. Under the percentage-of-completion accounting, EDS makes a profit
> assumption for the life of a contract and recognizes revenue accordingly. Based on
> the dispute and EDS' experience thus far on the Xerox contract, the original profit
> assumptions made by EDS were way off the mark. Erroneous contract profit
> assumptions have plagued EDS over the past several years. ***EDS has incurred
> significant "non-recurring" charges over the past three years related to contracts
> that have performed below expectations and/or have been terminated***.

192.    One internal auditor who worked for EDS from 1998 until mid-2000 and audited

certain EDS operating units in London, San Paulo and Argentina also criticized EDS's use of the

percentage-of-completion method prior to the Relevant Period. The auditor stated that if EDS had

budgeted $500,000 in costs to a contract, once costs reached a certain level, *i.e.*, $250,000, EDS

would consider the project 50% completed, regardless of the fact that the project may only have been

10% or 20% complete. Indeed, according to a second internal auditor working on the same internal

audit of foreign subdivisions, EDS outside auditor KPMG had sent EDS letters in 1996, 1997 and

1998 stating it was uncomfortable with the Company's accounting practices in EDS's non-U.S.

operating units.

193.    For example, one of these internal auditors discovered that EDS was improperly recognizing revenue on its contract with Golden Cross, Brazil's largest medical insurance company. EDS won the contract, which was worth $50 to $100 million, in 1997 or 1998 to perform data processing for the servicing of claims. As part of the project, EDS was required to write software to perform data processing. Golden Cross, however, had failed to provide EDS with sufficient information to complete the software and EDS could not complete the project. In January 1999, however, this internal auditor discovered that EDS was recognizing revenue under the contract despite its inability to write the necessary software. This auditor spent a day reviewing the contract with Scott Lundering, EDS's Vice President of Legal Affairs. When informed of the violation, Doreen Clements, EDS's Vice President of Worldwide Shared Services, and John Adams, EDS's controller, indicated their awareness of the problem.

194.    Knowing the Company's past unreliability in its ability to produce reasonably dependable estimates of costs to complete and the extent of progress toward completion of long-term contracts, defendants knew or were severely reckless in disregarding that similar deficiencies existed in its ability to estimate revenues and costs with respect to the Navy Contract. In May 2003, EDS revealed that it had discovered "deficiencies in the operational effectiveness of controls over the process for estimating revenues and costs for the remaining term of the Navy Contract," and that these deficiencies rose to the level of a "reportable condition." Generally Accepted Auditing Standards ("GAAS"), and specifically AU §325, ¶2, define a reportable condition as

> significant deficiencies in the design or operation of internal control, which could adversely affect the organization's ability to initiate, record, process, and report financial data consistent with the assertions of management in the financial statements.

195.    Although defendants did not specify the precise material deficiencies present in the Company's internal controls, they disclosed the following remedial measures being taken: increasing