the frequency and scope of operational and financial reviews with senior account personnel; staffing

its program management office with new staff; adhering to the process for approval of change orders

more strictly; reorganizing EDS's account support functions and appointing a senior service delivery

executive; assigning additional finance and legal staff to the Navy account; improving the

Company's monitoring and reporting seat deployment; and improving communication with senior

client representatives. Defendants' knowledge of these deficiencies or their severe recklessness in

not knowing that these deficiencies existed, combined with the other departures from GAAP set

forth above, precluded recognizing revenue under the Navy Contract using the percentage-of-

completion method of accounting.

196.    Further, ¶24 of SOP 81-1 provides that, "[f]or a contract on which a loss is

anticipated, generally accepted accounting principles require recognition of the entire anticipated

loss as soon as the loss becomes evident." EDS violated GAAP by not recording a provision for

losses on the Navy Contract in a timely manner. Provisions for losses must be made in the period in

which they become known under either the percentage-of-completion method or completed contract

method. SOP 81-1, ¶85. Defendants either knew, or were severely reckless in disregarding, that

EDS had incurred over $300 million in losses on the Navy Contract during the Class Period, which

EDS concealed from the public in violation of GAAP, due to severe implementation problems.

## VIOLATIONS OF SEC REGULATIONS

197.    Defendants represented that EDS's Relevant Period financial statements fairly

presented its business and financial condition. As set forth herein, these representations were

materially false and misleading because defendants caused EDS to issue false and misleading

financial statements that misrepresented and/or artificially and improperly inflated the Company's

operating results during the Class Period by failing to disclose the known trends and uncertainties in violation of SEC regulations.

198.    Item 7 of Form 10-K and Item 2 of Form 10-Q, Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), require the issuer to furnish information required by Item 303 of Regulation S-K [17 C.F.R. §229.303]. In discussing results of operations, Item 303 of Regulation S-K requires the registrant to:

Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

The instructions to paragraph 303(a) further state:

The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results ....

199.    In addition, the SEC, in its May 18, 1989 Interpretive Release No. 34-26831, has indicated that registrants should employ the following two-step analysis in determining when a known trend or uncertainty is required to be included in the MD&A disclosure pursuant to Item 303 of Regulation S-K:

A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have a material effects on the registrant's financial condition or results of operation.

200.    The MD&A requirements are intended to provide, in one section of a filing, material historical and prospective textual disclosure enabling investors and other users to assess the financial condition and results of operations of the registrant, with particular emphasis on the registrant's prospects for the future. As Securities Act Release No. 33-6711 states:

The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give the investor an opportunity to look at the company through the

eyes of management by providing both a short and long-term analysis of the business of the company.

201.     Section 229.303 (Item 303), management's discussion and analysis of financial condition and results of operations, states:

> To the extent that the financial statements disclose material increases in net sales or revenues, provide a narrative discussion of the extent to which such increases are attributable to increases in prices or to increases in the volume or amount of goods or services being sold or to the introduction of new products or services.

202.     According to Securities Act Release No. 33-6349:

> It is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company.

203.     Nonetheless, EDS's Relevant Period financial statements failed to disclose that from the beginning of WorldCom's and EDS's GNOA, the day-to-day working relationship between the two companies was very difficult in nature. Further, EDS failed to disclose that it had become evident from the beginning – and especially during the first year of the agreement in 2000 – that EDS would not meet its minimum purchase obligations with WorldCom. In 2001, WorldCom began booking EDS's "take or pay" penalty payment as revenues based on internal data showing EDS would not meet its minimum commitment. As a result of EDS's failure to meet its minimum requirements, the two parties engaged in lengthy and expensive arbitration proceedings during 2001. This information about EDS's much publicized and important financial relationship with WorldCom was reasonably likely to have a material adverse effect on EDS's operating results, which was necessary for a proper understanding and evaluation of the Company's operating performance and an informed investment decision. Defendant's failure to adequately disclose this information rendered EDS's publicly disseminated financial statements false and misleading and caused the Company's stock to trade at inflated prices during the Relevant Period.

## ALLEGATIONS AGAINST KPMG FOR PROFESSIONAL MALPRACTICE AND NEGLIGENCE AND FOR AIDING AND ABETTING THE INDIVIDUAL DEFENDANTS' VIOLATIONS OF THE LAW

204.    KPMG has been EDS's auditor since 1984.  It provided accounting and auditing services to EDS in addition to giving them accounting advice and consultation regarding EDS's annual and quarterly reports filed with the SEC during 2000-2002, which falsely overstated EDS's revenues and earnings.  To ensure KPMG's loyalty, defendants also engaged KPMG to provide lucrative tax and other services.  KPMG examined and opined on the financial statements of EDS, which KPMG helped prepare and which KPMG knew would be used, in whole or in part, to prepare the reported 2000-2002 annual and quarterly financial results and financial statements of EDS, and SEC filings and presentations to EDS shareholders.

205.    KPMG enjoyed a lucrative, long-standing business relationship with EDS's senior management for which it has received tens of millions of dollars.  For 2000-2003, KPMG received $32.4 million in audit fees and $36.4 million in fees for non-audit services.  Importantly, a large portion of KPMG's non-audit fees from EDS ($21.8 million) were for tax services.  KPMG has recently been implicated in a scandal involving KPMG's promotion of abusive tax shelters to many of its corporate clients.  A recent study by the U.S. Public Company Accounting Oversight Board found that KPMG accepted fees from independent-audit clients based on how much money it helped them save in taxes.  In such situations, KPMG's independence was at the very least suspect, if not impaired.

206.    KPMG partners responsible for the EDS engagement were particularly motivated to appease Brown and the other Individual Defendants because their remuneration was closely tied to the fees generated from EDS.  Maintaining the client relationship was highly dependent on the

Individual Defendants, particularly EDS's top executives, Brown, Daley and Heller, and KPMG compromised itself to maintain this relationship.

207.   In connection with its audit and review of EDS's finances and operations, KPMG had virtually limitless access to information in the Company's books and records:

(a)   KPMG was present at EDS's headquarters and key operating divisions frequently between 2000 and 2003.

(b)   KPMG regularly communicated with the Individual Defendants, including Brown, Daley and Heller, via face-to-face meetings and telephone calls.

(c)   KPMG provided EDS with substantial non-audit services to EDS, which as stated above included substantial fees for tax services.

(d)   KPMG had frequent conversations with EDS's management and employees about the Company's operations and financial statements.

(e)   KPMG audited and reviewed EDS's 1999-2003 financial statements and knew or should have known that EDS's financial statements were not accurate or prepared in compliance with GAAP, or SEC regulations.

208.   KPMG breached its duty to exercise reasonable care and competence in the course of providing professional accounting and auditing services for EDS. KPMG reviewed the quarterly and year-end results of EDS, advised and/or opined upon the veracity of EDS's SEC filings and had intimate knowledge of the nature of EDS's business, the status of the WorldCom/EDS disputes, and the intricacies of its method of recording revenue based upon its long-term contracts. KPMG also attended the meetings – and advised the members – of the EDS Audit Committee in connection with the Company's existing internal financial and accounting controls and the overall quality of EDS's

financial reporting. As a result of its intimate knowledge of EDS and its executives, KPMG knew or should have known about the accounting irregularities and improprieties at EDS as alleged herein.

209.    KPMG consented to the inclusion of its unqualified opinions in EDS's FY 2000-2002 financial statements, including EDS's SEC reports on Forms 10-K, which reports it knew, or should have known, were materially false. Despite KPMG's breach of its duty to exercise reasonable care and competence in performing its services for EDS by allowing defendants to misstate EDS's revenue and earnings and misrepresent the Company's financial condition, EDS's Boards of Directors, including the members of the Audit Committee, refused to terminate KPMG as EDS's "independent" auditors.

210.    At all relevant times, KPMG knew, or should have known, that EDS's financial statements and associated information were materially false and misleading because, among other things, they were not prepared in accordance with GAAP and included false reports of EDS's revenues and earnings for 2000-2002 and they failed to accurately disclose EDS's true financial business conditions as required by securities regulations because they failed to adequately disclose the status of the WorldCom Contract. KPMG also knew, or should have known based on its long-standing relationship with EDS and its senior management, that the false and misleading financial information would be used, in whole or in part, to prepare EDS's publicly reported annual and quarterly financial results and financial statements. Nevertheless, KPMG provided unqualified opinions that EDS's 2000-2002 financial statements were valid and accurate and thereby aided and abetted the Individual Defendants in breaching their fiduciary duties to EDS.

211.    Defendant KPMG owed a duty to EDS to perform its accounting and auditing services with reasonable care and competence. To discharge its duties, KPMG was required to adhere to GAAS, which require that:

(a)     The audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor;

(b)     In all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors;

(c)     Due professional care is to be exercised in the performance of the audit and the preparation of the report;

(d)     The work is to be adequately planned and assistants, if any, are to be properly supervised;

(e)     A sufficient understanding of the internal control structure is to be obtained to plan the audit and to determine the nature, timing and extent of the tests to be performed;

(f)     Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit;

(g)     The report shall state whether the financial statements are presented in accordance with GAAP;

(h)     The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period;

(i)     Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report; and

(j)     The report shall either contain an expression of an opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed. When an overall opinion cannot be expressed, the report should contain a clear-cut

indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.

212. Thus, KPMG owed EDS the obligation to act with reasonable care and competence in the performance of accounting and auditing services for the EDS. KPMG was required to exercise professional skepticism, an attitude that includes a questioning mind, including an increased recognition of the need to corroborate management representations and explanations concerning corporate matters where they had a direct financial interest in exaggeration or falsification.

213. KPMG is being sued in its capacity as an auditor of EDS. KPMG's liability arises from the fact that in not performing its services with reasonable care and competence, it allowed EDS's officers and/or directors to improperly recognize revenue and to fail to record losses associated with its long-term contracts in violation of GAAP and to inaccurately portray the Company's business condition.

214. KPMG represented it performed its audits in accordance with auditing standards in the U.S. As a result, KPMG was required to perform its audits in conformity with Statement of Accounting Standard ("SAS") No. 82, *Consideration of Fraud in a Financial Statement Audit*, which includes auditing for misstatements arising from the misappropriation of assets. KPMG failed to comply with SAS No. 82 in its audits of EDS's financial statements. During the course of its audits of EDS's financial statements from fiscal 2000-2003, KPMG knew of or should have discovered the irregularities which caused EDS's earnings to be misstated over several fiscal years. The very risk of fraud was a potential reportable condition which should have been reported to the Audit Committee and possibly senior management.

215. KPMG's failures to adequately perform its audit procedures to identify the improprieties alleged herein and its failure to report the problems permitted the accounting

irregularities and improprieties to continue over a period of at least three years, leading to false and misstated financial statements.

216.    Defendants have admitted on more than one occasion to "significant deficiencies" in EDS's internal control processes. In EDS's 1Q 03 10-Q filing in May of 2003, defendants admitted that with respect to the Company's Navy Contract there were "deficiencies in the operational effectiveness of controls over the process for estimating revenues and costs for the remaining term of the NMCI Contract." Thereafter, defendants announced that EDS's senior executives had implemented measures to correct and improve the effectiveness of the internal controls for the Navy Contract.

217.    Nonetheless, despite announcing that EDS's internal control problems were "fixed," defendants once again announced a year later additional problems in EDS's internal controls, specially those related to its accounting for the Navy Contract. In the 1Q 04 10-Q filing in May of 2004, defendants announced that there were other "errors in the [Navy] contract's percentage-of-completion accounting models with respect to the last two quarters of 2002." Further, defendants noted that in additional to these problems, they had discovered "a significant deficiency in the NMCI contract's purchasing and accrual process associated with certain hardware and subcontractor work-in-progress during 2003. This deficiency resulted in the untimely recognition of the purchase of certain hardware and assets under construction and is also considered to be a reportable condition due to the size of the NMCI contract."

218.    KPMG, as EDS's auditor, was obligated to assess EDS's internal disclosure, financial and accounting controls and whether such controls had been placed in operation, were effective and complied with Sarbanes-Oxley, including controls to provide assurance about the safeguarding of assets, financial reporting, operations and compliance with regulations. KPMG was required to

evaluate whether poor controls might lead to or contribute to the risk that fraud might not be detected.

219.    Internal controls are essential to a company's financial reporting, as adequately designed internal controls provide a company with reasonable assurance on the reliability of financial reporting, the effectiveness and efficiency of operations, and compliance with applicable laws and regulations. Auditing Standard ("AU") §319.06. Under auditing standards, as set forth in §319.02:

> In all audits, the auditor should obtain an understanding of internal control sufficient to plan the audit by performing procedures to understand the design of controls relevant to an audit of financial statements, and whether they have been placed in operation.

220.    If an auditor identifies any material weaknesses in a company's internal controls during an audit, then the auditor must communicate these weaknesses to the company's audit committee. AU §325. Further, the auditor should identify any limitations related to the internal control weaknesses in his or her audit opinion in accordance with the procedures proscribed by the professional standards.

221.    Defendants have admitted on several occasions to there being "significant deficiencies" in EDS's internal controls over its accounting for the Navy Contract – its most important contract.    In fact, after the first occasion, defendants announced that EDS had implemented measures to correct and improve the effectiveness of the internal controls for the Navy Contract and thereafter announced that its internal controls were effective. Nonetheless, a year later, defendants once again admitted to there being other deficiencies associated with the Navy Contract. Despite these deficiencies in EDS's internal controls, KPMG issued clean audit opinions year after year.

# DAMAGE TO EDS

222.    EDS has been badly damaged by defendants' fraudulent misconduct. Defrauded investors have sued EDS in two massive class action suits in the U.S. which have exposed EDS to billions of dollars of damage and will cost many millions of dollars to defend. In addition, EDS is being subjected to several governmental and regulatory investigations, including investigations by the SEC and the DOJ, which will cost millions to defend and will likely result in large fines and/or penalties. The credit rating agencies – Standard & Poor's, Fitch and Moody's – have all downgraded EDS's credit rating. Also, because of the damage to EDS's reputation and goodwill, the stock of EDS currently trades at a substantial discount to the stocks of its peer group competitor companies and is likely to suffer from what is known as the "liar's discount" going forward.

223.    While EDS and its public shareholders have suffered great damage and losses due to the deceit and deception committed by its insiders and the directorial oversight failings by the EDS Board, the insiders and directors of this public company have not only suffered no damages but, in fact, have profited from their participation in the illegal conduct. The managers of EDS pocketed millions of dollars in salaries and bonuses which would have been denied them had the truth been disclosed. These individuals have pocketed millions of dollars in salaries and bonus compensation as a result of their deceptive activities and the few individual officers who have been fired as scapegoats by the Board wishing to cover up its own participation and wrongdoing have left with millions of dollars in unjustly obtained compensation, bonuses and severance payments. As a result of their concealments and falsifications, most of the directors and the top managers of EDS held onto their positions of power, prestige and profit at the Company. The directors avoided not only the exposure and embarrassment of their oversight failures, but also continued in their prestigious and

profitable positions as directors of one of the largest companies in the U.S., enjoying the emoluments of their offices.

## FIRST CLAIM FOR RELIEF

### Breach of Fiduciary Duty Against All Individual Defendants

224.    Plaintiff incorporates ¶¶1-223.

225.    Each of the Individual Defendants knowingly, willfully, intentionally or recklessly permitted the actions taken to misstate EDS's financial statements in violation of applicable rules, regulations and industry standards, thus falsifying EDS's SEC filings and communications to shareholders and investors, including EDS's financial statements and information. These defendants knew that if they disclosed the true facts concerning EDS's business and financial condition, they would jeopardize their control over the Company, the remuneration they received and their positions of power, prestige and profit at EDS, while exposing themselves to suits and investigations and the risks of civil liability, criminal prosecution or regulatory action.

226.    As officers and directors of a publicly held company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to EDS's operations, financial condition, assets and earnings to their shareholders, as well as the financial markets. The Individual Defendants did not do this. Instead they concealed their wrongdoing and disseminated false and misleading statements and reports about EDS to its shareholders.

227.    The Individual Defendants, as officers and/or directors of EDS, participated in the acts of fraud and mismanagement alleged herein – knowingly, willfully, intentionally or recklessly. They thereby breached their fiduciary duties of care, candor, loyalty and disclosure to EDS's shareholders. They have thus exposed EDS to liability from, *inter alia*, class action suits for violation of the U.S. federal securities laws brought by and on behalf of those persons who

purchased EDS shares between February 7, 2001 and September 18, 2002 and two class action suits

alleging violations of ERISA during 2000-2001.

228.    The Individual Defendants also each owed a duty to EDS to test, oversee and monitor

its systems of internal disclosure, financial and accounting controls, governance procedures and

disclosure procedures and to ensure that they were functioning in an effective manner and in

compliance with, *inter alia*, the Sarbanes-Oxley Act. Pursuant to Sarbanes-Oxley, because EDS was

required to make accounting restatements due to noncompliance with GAAP and fraud in financial

reporting as a result of the misconduct alleged herein, the Individual Defendants who served as CEO

or CFO of EDS and each of its operating units, respectively, are required to reimburse EDS for the

bonuses and other incentive-based and equity-based compensation received by them from EDS

during the Relevant Period.

229.    Independent of Sarbanes-Oxley, all EDS's officers should be required to disgorge any

and all gains unjustly obtained at the expense of EDS and its shareholders by way of their fraudulent

conduct and breach of their fiduciary duties.

230.    The conduct outlined herein was not due to an honest error of judgment, but rather to

the defendants' bad faith and was done knowingly, willfully, intentionally or recklessly.

231.    By reason of the foregoing, EDS has been damaged.

## SECOND CLAIM FOR RELIEF

### Abuse of Control Against All Individual Defendants

232.    Plaintiff incorporates ¶¶1-231.

233.    For the purpose of maintaining and entrenching themselves in their positions of

power, prestige and profit at, and their control over, EDS and to continue to receive the substantial

benefits, salaries and emoluments associated with their positions, the Individual Defendants

employed the alleged scheme. As a part of this scheme, these Individual Defendants actively made

- 113 -

and/or participated in the making of or aided and abetted the making or the concealment of, numerous omissions and misrepresentations of facts regarding EDS to shareholders.   These representations and statements were untrue and the Individual Defendants did not believe them to be true when made, and knowingly, willfully and/or intentionally made them without regard to their truthfulness or aided and abetted the making of said representations.

234.   The Individual Defendants' conduct constituted an abuse of their ability to control and influence EDS.  By reason of the foregoing, EDS has been damaged.

### THIRD CLAIM FOR RELIEF

### Gross Mismanagement Against All Individual Defendants

235.   Plaintiff incorporates ¶¶1-234.

236.   The Individual Defendants had a duty to EDS and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of EDS.

237.   These Individual Defendants by their actions and by engaging in the fraud described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of EDS in a manner consistent with the duties imposed upon them by law, including Sarbanes-Oxley.  By committing and concealing this fraud, the Individual Defendants breached their duties of due care, diligence and candor in the management and administration of EDS's affairs and in the use and preservation of EDS's assets.

238.   The Individual Defendants caused EDS to engage in a fraud upon purchasers of its stock.  During the course of the discharge of their duties, these defendants knew or recklessly disregarded the unreasonable risks and losses associated with their fraud and misconduct, yet these defendants caused EDS to engage in this scheme which they knew had an unreasonable risk of

damage to EDS, thus breaching their duties to the Company. As a result, the Individual Defendants grossly mismanaged EDS.

239.   By reason of the foregoing, EDS has been damaged.

## FOURTH CLAIM OF RELIEF

### Constructive Fraud Against All Individual Defendants

240.   Plaintiff incorporates ¶¶1-239.

241.   As corporate fiduciaries, the Individual Defendants owed to EDS and its shareholders a duty of candor and full accurate disclosure regarding the true state of EDS's business and assets and their conduct with regard thereto.

242.   As a result of the conduct complained of, the Individual Defendants made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material facts from EDS shareholders despite their duties to, *inter alia*, disclose the true facts regarding their stewardship of EDS. Thus they have committed constructive fraud and violated their duty of candor.

243.   By reason of the foregoing, EDS has been damaged.

## FIFTH CLAIM FOR RELIEF

### Waste and Unjust Enrichment Against All Individual Defendants

244.   Plaintiff incorporates ¶¶1-243.

245.   As a result of the conduct described above, all the Individual Defendants will be and have been unjustly enriched at the expense of EDS in the form of unjustified salaries, benefits, bonuses, stock options and grants and other emoluments of office, as well as illegal insider stock sales. These payments were a waste of EDS's corporate assets.

246.   Certain defendants also obtained severance benefits that were not earned or justified but were instead paid as part of a scheme to cover up the Director Defendants' complicity in the scheme.

247.    All the payments and benefits provided to these defendants were at the expense of EDS, which received no benefit from these payments.  EDS was damaged by such payments.

## SIXTH CLAIM FOR RELIEF

### Professional Negligence and Accounting Malpractice
### Against KPMG

248.    Plaintiff incorporates ¶¶1-223.

249.    KPMG issued unqualified opinions on the 2000-2003 financial statements of EDS, stating that those financial statements were presented in accordance with GAAP based on KPMG's audits which were performed in accordance with GAAS.  GAAS, as approved and adopted by the American Institute of Certified Public Accountants ("AICPA"), govern the conduct of audit engagements.  In fact, the audit reports were false and misleading due to, among other things, KPMG's failure to conduct the audits in accordance with GAAS and the fact that EDS's 2000-2003 financial statements were not prepared in conformity with GAAP.  KPMG's reports were in violation of GAAS, GAAP and SEC rules.

250.    The objective of audits of financial statements by the independent auditor is the expression of an opinion on the fairness with which they present, in all material respects, financial position, results of operations and cash flows in conformity with GAAP.  The auditor's report is the medium through which he expresses his opinion or, if circumstances require, disclaims an opinion. In either case, he states his audit has been in accordance with GAAS.  These standards require him to state whether, in his opinion, the financial statements are presented in accordance with GAAP and to identify those circumstances in which such principles have not been consistently observed in the preparation of the financial statements of the current period in relation to those of the preceding period.  AU §110.01.

251.    GAAS, as approved and adopted by the membership of the AICPA, are comprised of 10 general standards.  These standards to a great extent are interrelated and interdependent.  The independent auditor is responsible for compliance with GAAS in an audit engagement.  The 10 general standards are as follows:

General Standards

1.    The audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor.

2.    In all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors.

3.    Due professional care is to be exercised in the performance of the audit and the preparation of the report.

Standards of Fieldwork

1.    The work is to be adequately planned and assistants, if any, are to be properly supervised.

2.    A sufficient understanding of the internal control structure is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed.

3.    Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

Standards of Reporting

1.    The report shall state whether the financial statements are presented in accordance with generally accepted accounting principles (GAAP).

2.    The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.

3.    Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

4.    The report shall either contain an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed.  When an overall opinion cannot be expressed, the reasons therefore should be stated.  In all cases where an auditor's name is associated with

financial statements, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.

252.    KPMG's audits of EDS's 2000-2003 financial statements violated each of the general standards.

253.    KPMG is one of the largest international firms of certified public accountants and is a member of the AICPA. KPMG was the auditor of EDS's financial statements for 2000-2003. In addition, they were paid to review the quarterly financial statements of EDS throughout this period. KPMG audited EDS's 2000-2003 financial statements and issued their audit opinions stating that those financial statements were fairly presented in accordance with GAAP and that they had audited those financial statements in accordance with GAAS. Both of those statements were false. KPMG was aware of facts that undeniably precluded them from the making of those statements at the time they were made. EDS's financial statements and KPMG's opinions on them were then used by EDS with KPMG's consent to publicly disseminate EDS's 2000-2003 financial results in the filing of their annual Forms 10-K with the SEC.

254.    KPMG was negligent in failing to comply with GAAS as EDS's independent accountant. EDS issued unqualified opinions stating that the financial statements of EDS were fairly presented in accordance with GAAP when they were aware of or should have been aware of facts and circumstances that undermined such unqualified opinions and rendered them false and misleading.

255.    In the course of performing their audit services, KPMG obtained evidential matter revealing the adverse facts detailed above about EDS's improper recognition of revenue, but improperly failed to require them to adjust their financial statements or make disclosure of such facts. As a result of their investigations and audit work, KPMG knew that the reports and financial

statements described herein were materially misleading or negligently disregarded facts that showed that all such statements were materially misleading.

256.    KPMG failed to require EDS to disclose material adverse facts and allowed the Company to make material misrepresentations to their shareholders and to the investing public.

257.    KPMG violated GAAS General Standard No. 3 that requires that due professional care must be exercised by the auditor in performance of the examination and the preparation of the audit report.

258.    KPMG violated GAAS Standard of Field Work No. 2 that requires the auditor to make a proper study of existing internal controls, to determine whether reliance thereon was justified, and if such controls are not reliable, to expand the nature and scope of the auditing procedures to be applied. KPMG, knowing that EDS's internal controls were insufficient, failed to expand its auditing procedures.

259.    KPMG violated GAAS Standard of Field Work No. 3 that requires sufficient competent evidential matter be obtained through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion to be issued on the subject financial statements. As described above, KPMG failed to obtain sufficient competent evidential matter as to EDS's recognition of revenue under its long-term contracts.

260.    KPMG violated GAAS Standard of Reporting No. 1 that requires the audit report state whether the financial statements are presented in accordance with GAAP. KPMG's opinions falsely represented that EDS's financial statements complied with GAAP, when KPMG knew or negligently disregarded that they did not for the reasons herein alleged.

261.    KPMG violated GAAS Standard of Reporting No. 4 that requires, when an opinion on the financial statements as a whole cannot be expressed, that the reasons be stated. KPMG should

have either stated that no opinion could be issued by them on EDS's financial statements or issued an adverse opinion stating that the financial statements were not fairly presented.

262.    KPMG violated Standard of Field Work No. 1 and the standards set forth in AU §§310, 320 and 327 by, among other things, failing to adequately plan its audit and properly supervise the work of its assistants so as to establish and carry out procedures reasonably designed to search for and detect the existence of errors and irregularities that would have a material effect upon the financial statements.

263.    KPMG violated SAS No. 16 in that it failed to perform its examination with an attitude of professional skepticism and, in connection with the year-end 2003 audits, ignored numerous "red flags" that would reasonably have led to the discovery of the fraudulent overstatement of EDS's revenues and earnings, and to the serious deficiencies in EDS's internal control system.

264.    KPMG violated AU §316.20, which requires that additional procedures should be performed when evaluation at the financial-statement level indicates significant risk.

265.    As a result of the foregoing, KPMG's certification of EDS's 2000-2003 financial statements falsely represented that the statements were audited pursuant to GAAS and that EDS's financial statements were presented in conformity with GAAP. KPMG knew that such certifications were false and misleading because, as detailed herein: (a) KPMG knew or was negligent in not knowing that the Company's financial statements violated GAAP; and (b) KPMG knew it had not complied with GAAS.

266.    As a result of the services rendered to EDS, KPMG's personnel were present at EDS's corporate headquarters and major operating offices and examined or participated in reviews, investigations and audit procedures regarding the financial condition, business operations and

financial, accounting and management-control systems of EDS. In the course of performing such services, KPMG had virtually unlimited access to substantial evidential matter revealing the adverse facts about the Company's compliance with educational finance reporting requirements and laws and the finances of EDS, but improperly failed to require adjustment for or disclosure of such facts.

267.   KPMG: (a) knew or was negligent in not knowing of the material, adverse, non-public information about the financial statements of EDS, which was not disclosed; and (b) anticipated in drafting, reviewing and/or approving the misleading statements, releases, reports and other public representations of and about EDS pleaded herein, involving the SEC reports on Form 10-K.

268.   In performing auditing and accounting services on behalf of EDS and engaging in the wrongful acts alleged herein, KPMG knew or should have known that its clients would, and did, transmit false and misleading financial information to the investing public. However, KPMG failed to discharge its duties in adherence to GAAP and GAAS to detect errors and irregularities.

269.   In performing the auditing and accounting services to EDS in the manner alleged herein, KPMG owed a duty to EDS and its shareholders to use such skill, care and diligence as other members of its profession commonly exercised. KPMG, however, breached such duty by committing the wrongful acts and conduct alleged herein.

270.   EDS relied to its detriment on the accountants and was damaged thereby.

271.   As a direct, foreseeable and proximate result of KPMG's breach of duties owed to EDS, it was damaged.

**SEVENTH CLAIM FOR RELIEF**

**Aiding and Abetting Breaches of Fiduciary Duty,**
**Abuse of Control, Unjust Enrichment and Gross Mismanagement**
**Against KPMG**

272.   Plaintiff incorporates ¶¶1-271.

273.   Defendant KPMG abetted the Individual Defendants in breaching their fiduciary obligations owed to EDS resulting in the wrongdoing and damages to EDS complained of herein. KPMG knew or should have known that the 2000-2003 SEC reports and financial statements contained therein were materially false and misleading. KPMG also knew, or should have known, that the false and misleading information would be used, in whole or in part, by EDS to prepare its publicly reported financial results and financial statements. Nevertheless, KPMG actively prepared the false and misleading information and thereby aided and abetted defendants' breaches of fiduciary duty and their abuse of control, gross mismanagement and violation of their duty of candor to EDS and its shareholders, complained of herein.

274.   As a direct, foreseeable and proximate result of KPMG's aiding and abetting of defendants' breaches of fiduciary duty, EDS has been damaged.

# PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.   awarding money damages against all defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure defendants do not participate therein or benefit thereby;

B.   directing all defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds and imposing a constructive trust thereon;

C.      directing EDS to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with Sarbanes-Oxley, including, but not limited to:

(i)      Appropriately testing and then strengthening the internal audit and control functions;

(ii)     Controlling and limiting insider stock selling; and

(iii)    Reforming executive compensation.

D.      awarding punitive damages;

E.      awarding costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees; and

F.      granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  October 14, 2004          PROVOST & UMPHREY LAW FIRM LLP
                                  JOE KENDALL (Bar No. 11260700)
                                  WILLIE C. BRISCOE (Bar No. 24001788)

                                  *Joe Kendall*

                                  ~~WILLIE C. BRISCOE~~

                                  3232 McKinney Avenue, Suite 700
                                  Dallas, TX  75204
                                  Telephone: 214/744-3000
                                  214/744-3015 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
ARTHUR C. LEAHY
PATRICK W. DANIELS
MARY K. BLASY


_____
WILLIAM S. LERACH

401 B Street, Suite 1700
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

S:\CptDraft\Derivative\Cpt EDS wsl deriv.doc

## VERIFICATION

I, William S. Lerach, hereby declare as follows:

I am a member of the law firm of Lerach Coughlin Stoia Geller Rudman & Robbins LLP, counsel for plaintiffs in the above-entitled action. I have read the foregoing Complaint and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated herein are true.

I make this Verification because plaintiffs are absent from the County of San Diego where I maintain my office.

Executed this 14th day of October, 2004, at San Diego, California.

_____

WILLIAM S. LERACH